# PACIFIC MUTUAL LIFE INSURANCE CO. *v.* HASLIP ET AL.

No. 89–1279.   Argued October 3, 1990—Decided March 4, 1991

1

BLACKMUN, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, MARSHALL, and STEVENS, JJ., joined. SCALIA, J., *post*, p. 24, and KENNEDY, J., *post*, p. 40, filed opinions concurring in the judgment. O'CONNOR, J., filed a dissenting opinion, *post*, p. 42. SOUTER, J., took no part in the consideration or decision of the case.

*Bruce A. Beckman* argued the cause for petitioner. With him on the briefs were *J. Mark Hart* and *Bert S. Nettles*.

*Bruce J. Ennis, Jr.*, argued the cause for respondents. With him on the brief were *Donald B. Verrilli, Jr., Charles E. Sharp, John F. Whitaker, Robert H. Adams*, and *Andrew T. Citrin*.*

---

*Briefs of *amici curiae* urging reversal were filed for the City of New York by *Victor A. Kovner, Leonard J. Koerner*, and *John Hogrogian;* for the Alliance of American Insurers et al. by *Erwin N. Griswold, Patricia A. Dunn, Kenneth H. Nails, James H. Bradner, Jr., Richard E. Goodman, Richard E. Barnsback, Phillip E. Stano, Joe W. Peel, Theresa L. Sorota, Patrick J. McNally*, and *John J. Nangle;* for the American Institute of Architects et al. by *Rex E. Lee, Carter G. Phillips, Benjamin W. Heineman, Jr., Philip A. Lacovara*, and *Thomas Schmidt;* for Arthur Andersen & Co. et al. by *Leonard P. Novello, Jon N. Ekdahl*, and *Harris J. Amhowitz;* for the Association for California Tort Reform by *Ellis J. Horvitz, S. Thomas Todd*, and *Fred J. Hiestand;* for the Business Roundtable et al. by *Andrew L. Frey, Kenneth S. Geller, Mark I. Levy*, and *Andrew J. Pincus;* for Bethlehem Steel Corp. et al. by *Martin S. Kaufman;* for the Center for Claims Resolution by *John D. Aldock, Laura S. Wertheimer*, and *Edmund K. John;* for the Chamber of Commerce of the United States et al. by *Malcolm E. Wheeler, Stephen A. Bokat, Jan S. Amundson*, and *Nancy Nord;* for the Defense Research Institute by *John Calvin Jeffries, Jr.*, and *George Clemon Freeman, Jr.;* for the Equal Employment Advisory Council by *Robert E. Williams, Douglas S. McDowell*, and *Ann Elizabeth Reesman;* for the Hospital Authority of Gwinnett County, Georgia, by *Harold N. Hill, Jr.*, and *E. Clayton Scofield III;* for Liability Insurance Underwriters by *Thomas P. Kane* and *Donald V. Jernberg;* for the Pharmaceutical Manufacturers Association et al. by *Richard F. Kingham, Bruce N. Kuhlik*, and *Kirk B. Johnson;* for the Southeastern Legal Foundation, Inc., by *Robert L. Barr, Jr.*, and *G. Stephen Parker;* and for the Washington Legal Foundation et al. by *Daniel J. Popeo* and *Richard A. Samp*.

Briefs of *amici curiae* urging affirmance were filed for the State of Alabama et al. by *Don Siegelman*, Attorney General of Alabama, and *George E. Jones III*, Assistant Attorney General, *John K. Van de Kamp*, Attorney General of California, and *Michael J. Strumwasser*, Special Assistant Attorney General, and *Jim Mattox*, Attorney General of Texas; for the Association of Trial Lawyers of America by *Jeffrey Robert White* and *Russ M. Herman;* for the California Trial Lawyers Association by *Roland Wrin-*

4

JUSTICE BLACKMUN delivered the opinion of the Court.

This case is yet another that presents a challenge to a punitive damages award.

I

In 1981, Lemmie L. Ruffin, Jr., was an Alabama-licensed agent for petitioner Pacific Mutual Life Insurance Company. He also was a licensed agent for Union Fidelity Life Insurance Company. Pacific Mutual and Union are distinct and nonaffiliated entities. Union wrote group health insurance for municipalities. Pacific Mutual did not.

Respondents Cleopatra Haslip, Cynthia Craig, Alma M. Calhoun, and Eddie Hargrove were employees of Roosevelt City, an Alabama municipality. Ruffin, presenting himself as an agent of Pacific Mutual, solicited the city for both health and life insurance for its employees. The city was interested. Ruffin gave the city a single proposal for both coverages. The city approved and, in August 1981, Ruffin prepared separate applications for the city and its employees for group health with Union and for individual life policies with Pacific Mutual. This packaging of health insurance with life

kle; for the Consumers Union of United States by *Andrew F. Popper;* and for Trial Lawyers for Public Justice by *Michael V. Ciresi.*

Briefs of *amici curiae* were filed for Aetna Life Insurance Co. et al. by *Theodore B. Olson, Larry L. Simms,* and *George R. Katosic;* for the Alabama Defense Lawyers Association by *Davis Carr;* for the Alabama Trial Lawyers Association by *John W. Haley* and *Bruce J. McKee;* for CBS Inc. et al. by *P. Cameron DeVore, Marshall J. Nelson, Douglas P. Jacobs, Richard J. Tofel, John C. Fontaine, Richard M. Schmidt, Jr., Jane E. Kirtley, Bruce W. Sanford,* and *J. Laurent Scharff;* for the Church of Scientology of California by *Eric M. Lieberman* and *Michael Lee Hertzberg;* for the Mid-America Legal Foundation by *Martha A. Churchill;* for the National Association of Mutual Insurance Companies by *Forrest S. Latta* and *Geoffrey C. Hazard, Jr.;* for the National Association of Wholesaler-Distributors et al. by *Clifton S. Elgarten* and *James T. McIntyre;* for the National Council of Churches of Christ in the U. S. A. et al. by *Michael J. Woodruff* and *Forest D. Montgomery;* and for the National Insurance Consumer Organization by *Roger O'Sullivan.*

insurance, although from different and unrelated insurers, was not unusual. Indeed, it tended to boost life insurance sales by minimizing the loss of customers who wished to have both health and life protection. The initial premium payments were taken by Ruffin and submitted to the insurers with the applications. Thus far, nothing is claimed to have been out of line. Respondents were among those with the health coverage.

An arrangement was made for Union to send its billings for health premiums to Ruffin at Pacific Mutual's Birmingham office. Premium payments were to be effected through payroll deductions. The city clerk each month issued a check for those premiums. The check was sent to Ruffin or picked up by him. He, however, did not remit to Union the premium payments received from the city; instead, he misappropriated most of them. In late 1981, when Union did not receive payment, it sent notices of lapsed health coverage to respondents in care of Ruffin and Patrick Lupia, Pacific Mutual's agent-in-charge of its Birmingham office. Those notices were not forwarded to respondents. Although there is some evidence to the contrary, see Reply Brief for Petitioner B1–B4, the trial court found, App. to Pet. for Cert. A2, that respondents did not know that their health policies had been canceled.

## II

Respondent Haslip was hospitalized on January 23, 1982. She incurred hospital and physician's charges. Because the hospital could not confirm health coverage, it required Haslip, upon her discharge, to make a payment upon her bill. Her physician, when he was not paid, placed her account with a collection agency. The agency obtained a judgment against Haslip, and her credit was adversely affected.

In May 1982, respondents filed this suit, naming as defendants Pacific Mutual (but not Union) and Ruffin, individually and as a proprietorship, in the Circuit Court for Jef-

ferson County, Ala. It was alleged that Ruffin collected premiums but failed to remit them to the insurers so that respondents' respective health insurance policies lapsed without their knowledge. Damages for fraud were claimed. The case against Pacific Mutual was submitted to the jury under a theory of *respondeat superior*.

Following the trial court's charge on liability, the jury was instructed that if it determined there was liability for fraud, it could award punitive damages. That part of the instructions is set forth in the margin.[1] Pacific Mutual made no objection on the ground of lack of specificity in the instructions, and it did not propose a more particularized charge. No evidence was introduced as to Pacific Mutual's financial worth. The jury returned general verdicts for respondents against Pacific Mutual and Ruffin in the following amounts:

---

[1] "Now, if you find that fraud was perpetrated then in addition to compensatory damages you may in your discretion, when I use the word discretion, I say you don't have to even find fraud, you wouldn't have to, but you may, the law says you may award an amount of money known as punitive damages.

"This amount of money is awarded to the plaintiff but it is not to compensate the plaintiff for any injury. It is to punish the defendant. Punitive means to punish or it is also called exemplary damages, which means to make an example. So, if you feel or not feel, but if you are reasonably satisfied from the evidence that the plaintiff, whatever plaintiff you are talking about, has had a fraud perpetrated upon them and as a direct result they were injured and in addition to compensatory damages you may in your discretion award punitive damages.

"Now, the purpose of awarding punitive or exemplary damages is to allow money recovery to the plaintiffs, it does to the plaintiff, by way of punishment to the defendant and for the added purpose of protecting the public by detering *[sic]* the defendant and others from doing such wrong in the future. Imposition of punitive damages is entirely discretionary with the jury, that means you don't have to award it unless this jury feels that you should do so.

"Should you award punitive damages, in fixing the amount, you must take into consideration the character and the degree of the wrong as shown by the evidence and necessity of preventing similar wrong." App. 105–106.

| Haslip: | $1,040,000[2] | Calhoun: | $15,290 |
|---|---|---|---|
| Craig: | $12,400 | Hargrove: | $10,288 |

Judgments were entered accordingly.

On Pacific Mutual's appeal, the Supreme Court of Alabama, by a divided vote, affirmed. 553 So. 2d 537 (1989). In addition to issues not now before us, the court ruled that, while punitive damages are not recoverable in Alabama for misrepresentation made innocently or by mistake, they are recoverable for deceit or willful fraud, and that on the evidence in this case a jury could not have concluded that Ruffin's misrepresentations were made either innocently or mistakenly. *Id.*, at 540. The majority then specifically upheld the punitive damages award. *Id.*, at 543.

One justice concurred in the result without opinion.[3] *Ibid.* Two justices dissented in part on the ground that the award of punitive damages violated Pacific Mutual's due process rights under the Fourteenth Amendment. *Id.*, at 544–545.

Pacific Mutual, but not Ruffin, then brought the case here. It challenged punitive damages in Alabama as the product of unbridled jury discretion and as violative of its due process rights. We stayed enforcement of the Haslip judgment, 493 U. S. 1014 (1990), and then granted certiorari, 494 U. S.

---

[2] Although there is controversy about the matter, it is probable that the general verdict for respondent Haslip contained a punitive damages component of not less than $840,000. In Haslip's counsel's argument to the jury, compensatory damages of $200,000 (including out-of-pocket expenditures of less than $4,000) and punitive damages of $3,000,000 were requested. Tr. 810–814. For present purposes, we accept this description of the verdict.

[3] This justice, in a later case, appears to have rethought his position with respect to punitive damages under Alabama law. See *Charter Hospital of Mobile, Inc.* v. *Weinberg*, 558 So. 2d 909, 913 (1990) (Houston, J., concurring specially). He did not address the question of the constitutionality of punitive damages in Alabama under the United States Constitution. *Id.*, at 914.

8

1065 (1990), to review the punitive damages procedures and award in the light of the long-enduring debate about their propriety.[4]

---

[4] Compare, *e. g., Fay* v. *Parker*, 53 N. H. 342, 382 (1872) ("The idea is wrong. It is a monstrous heresy. It is an unsightly and an unhealthy excrescence, deforming the symmetry of the body of the law"), with *Luther* v. *Shaw*, 157 Wis. 234, 238, 147 N. W. 18, 19–20 (1914) (Timlin, J., "Speaking for myself only in this paragraph . . . . The law giving exemplary damages is an outgrowth of the English love of liberty regulated by law. It tends to elevate the jury as a responsible instrument of government, discourages private reprisals, restrains the strong, influential, and unscrupulous, vindicates the right of the weak, and encourages recourse to and confidence in the courts of law by those wronged or oppressed by acts or practices not cognizable in or not sufficiently punished by the criminal law").

This debate finds replication in the many *amicus* briefs filed here. See, *e. g.*, Brief for Alliance of American Insurers et al. 5 ("The Due Process Clause imposes substantive limits on the amounts of punitive damages that civil juries can award. This conclusion is evident from history"); Brief for American Institute of Architects et al. 4 ("Punitive damages are today awarded with a frequency and in amounts that are startling . . . . This system of punitive damages—where punitive awards are routine and fantastic verdicts receive little attention—is entirely a product of the last 20 years"); Brief for Business Roundtable et al. 2 ("[A]n award that is not rationally related to the retributive and deterrent purposes of punitive damages is unconstitutionally excessive"); Brief for Defense Research Institute 2 ("No society concerned for fairness and regularity in the administration of justice can afford to tolerate an essentially lawless regime of punishment"); Brief for Pharmaceutical Manufacturers Association et al. 4 ("[A]ny award of punitive damages for lawful conduct approved in advance by the [Food and Drug Administration] must be deemed arbitrary and excessive"); Brief for Aetna Life Insurance Co. et al. 6 ("[A] State may impose punishment on its citizens only pursuant to standards established in advance"); Brief for Hospital Authority of Gwinnett County, Georgia, 2 ("[I]n the absence of a statute . . . an award of punitive damages . . . violates the defendant's right to due process . . . unless it is shown by clear and convincing evidence that the act constituted a crime . . . . [A]wards of punitive damages in excess of twice the amount of actual damages (that is, awards in excess of treble damages) . . . violate . . . due process . . ."); Brief for Mid-America Legal Foundation 8 ("[S]ystem as applied today merely introduces a wildcard into the legal process . . ."); Brief for As-

## III

This Court and individual Justices thereof on a number of occasions in recent years have expressed doubts about the constitutionality of certain punitive damages awards.

In *Browning-Ferris Industries of Vt., Inc.* v. *Kelco Disposal, Inc.*, 492 U. S. 257 (1989), all nine participating Members of the Court noted concern. In that case, punitive damages awarded on a state-law claim were challenged under the Eighth and Fourteenth Amendments and on federal common-law grounds. The majority held that the Excessive Fines Clause of the Eighth Amendment did not apply to a punitive damages award in a civil case between private parties; that the claim of excessiveness under the Due Process Clause of the Fourteenth Amendment had not been raised in either the District Court or the Court of Appeals and therefore was not to be considered here; and that federal common law did not provide a basis for disturbing the jury's punitive damages award. The Court said:

> "The parties agree that due process imposes some limits on jury awards of punitive damages, and it is not disputed that a jury award may not be upheld if it was the product of bias or passion, or if it was reached in proceedings lacking the basic elements of fundamental fairness. But petitioners make no claim that the proceedings themselves were unfair, or that the jury was biased or blinded by emotion or prejudice. Instead, they seek

sociation for California Tort Reform 2 ("Until state legislatures do their job and set maximum limits for punitive awards and establish meaningful criteria for juries to use, punitive damages are *per se* a violation of due process"); Brief for Association of Trial Lawyers of America 3 ("There is no 'explosion' . . . . [P]unitive damages neither deter innovation nor place American businesses at a competitive disadvantage . . ."); Brief for National Insurance Consumer Organization 3 ("Punitive damages have developed as the most effective means by which the states can protect their citizens against corporate misconduct"); Brief for State of Alabama et al. 1 ("[T]he States—and not this Court—should decide how and when punitive damages may be assessed in civil cases between private litigants").

further due process protections, addressed directly to the size of the damages award. There is some authority in our opinions for the view that the Due Process Clause places outer limits on the size of a civil damages award made pursuant to a statutory scheme . . . but we have never addressed the precise question presented here: whether due process acts as a check on undue jury discretion to award punitive damages in the absence of any express statutory limit . . . . That inquiry must await another day." *Id.*, at 276–277.

Justice Brennan, joined by JUSTICE MARSHALL, wrote separately:

"I join the Court's opinion on the understanding that it leaves the door open for a holding that the Due Process Clause constrains the imposition of punitive damages in civil cases brought by private parties. . . .

.    .    .    .    .

"Without statutory (or at least common-law) standards for the determination of how large an award of punitive damages is appropriate in a given case, juries are left largely to themselves in making this important, and potentially devastating, decision. . . .

.    .    .    .    .

"Since the Court correctly concludes that Browning-Ferris' challenge based on the Due Process Clause is not properly before us, however, I leave fuller discussion of these matters for another day." *Id.*, at 280–282.

JUSTICE O'CONNOR, joined by JUSTICE STEVENS, concurring in part and dissenting in part, observed:

"Awards of punitive damages are skyrocketing. . . .

.    .    .    .    .

". . . I do . . . agree with the Court that no due process claims—either procedural or substantive—are properly presented in this case, and that the award of punitive damages here should not be overturned as a matter of

federal common law. . . . Moreover, I share JUSTICE BRENNAN's view, *ante*, at 280–282, that nothing in the Court's opinion forecloses a due process challenge to awards of punitive damages or the method by which they are imposed . . . ." *Id.*, at 282–283.

In *Bankers Life & Casualty Co.* v. *Crenshaw*, 486 U. S. 71 (1988), a challenge to a punitive damages award was made. The Court, however, refused to reach claims that the award violated the Due Process Clause and other provisions of the Federal Constitution since those claims had not been raised and passed upon in state court. *Id.*, at 76–80. JUSTICE O'CONNOR, joined by JUSTICE SCALIA, concurring in part and concurring in the judgment, said:

"Appellant has touched on a due process issue that I think is worthy of the Court's attention in an appropriate case. Mississippi law gives juries discretion to award any amount of punitive damages in any tort case in which a defendant acts with a certain mental state. In my view, because of the punitive character of such awards, there is reason to think that this may violate the Due Process Clause.

. . . . .

"This due process question, serious as it is, should not be decided today. . . . I concur in the Court's judgment on this question and would leave for another day the consideration of these issues." *Id.*, at 87–89.

In *Aetna Life Ins. Co.* v. *Lavoie*, 475 U. S. 813 (1986), another case that came here from the Supreme Court of Alabama, the appellant argued that the imposition of punitive damages was impermissible under the Eighth Amendment and violated the Due Process Clause of the Fourteenth Amendment. The Court stated: "These arguments raise important issues which, in an appropriate setting, must be resolved; however, our disposition of the recusal-for-bias issue makes it unnecessary to reach them." *Id.*, at 828–829.

See also *Newport* v. *Fact Concerts, Inc.*, 453 U. S. 247, 270–271 (1981) ("The impact of such a windfall recovery is likely to be both unpredictable and, at times, substantial . . ."); *Electrical Workers* v. *Foust*, 442 U. S. 42, 50–51 (1979); *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323, 350 (1974) ("In most jurisdictions jury discretion over the amounts awarded is limited only by the gentle rule that they not be excessive. Consequently, juries assess punitive damages in wholly unpredictable amounts bearing no necessary relation to the actual harm caused"); *Rosenbloom* v. *Metromedia, Inc.*, 403 U. S. 29, 82–84 (1971) (MARSHALL, J., joined by Stewart, J., dissenting); *Missouri Pacific R. Co.* v. *Tucker*, 230 U. S. 340, 351 (1913); *Southwestern Telegraph & Telephone Co.* v. *Danaher*, 238 U. S. 482, 491 (1915); *St. Louis, I. M. & S. R. Co.* v. *Williams*, 251 U. S. 63, 67 (1919).

The constitutional status of punitive damages, therefore, is not an issue that is new to this Court or unanticipated by it. Challenges have been raised before; for stated reasons, they have been rejected or deferred. For example, in *Browning-Ferris, supra,* we rejected the claim that punitive damages awarded in a civil case could violate the Eighth Amendment and refused to consider the tardily raised due process argument. But the Fourteenth Amendment due process challenge is here once again.

## IV

Two preliminary and overlapping due process arguments raised by Pacific Mutual deserve attention before we reach the principal issue in controversy. Did Ruffin act within the scope of his apparent authority as an agent of Pacific Mutual? If so, may Pacific Mutual be held responsible for Ruffin's fraud on a theory of *respondeat superior?*

Pacific Mutual was held responsible for the acts of Ruffin. The insurer mounts a challenge to this result on substantive due process grounds, arguing that it was not shown that either it or its Birmingham manager was aware that Ruffin

was collecting premiums contrary to his contract; that Pacific Mutual had no notice of the actions complained of prior to the filing of the complaint in this litigation; that it did not authorize or ratify Ruffin's conduct; that his contract with the company forbade his collecting any premium other than the initial one submitted with an application; and that Pacific Mutual was held liable and punished for unauthorized actions of its agent for acts performed on behalf of another company. Thus, it is said, when punitive damages were imposed on Pacific Mutual, the focus for determining the amount of those damages shifted from Ruffin, where it belonged, to Pacific Mutual, and obviously and unfairly contributed to the amount of the punitive damages and their disproportionality. Ruffin was acting not to benefit Pacific Mutual but for his own benefit, and to hold Pacific Mutual liable is "beyond the point of fundamental fairness," Brief for Petitioner 29, embodied in due process, *id.*, at 32. It is said that the burden of the liability comes to rest on Pacific Mutual's other policyholders.

The jury found that Ruffin was acting as an employee of Pacific Mutual when he defrauded respondents. The Supreme Court of Alabama did not disturb that finding. There is no occasion for us to question it, for it is amply supported by the record. Ruffin had actual authority to sell Pacific Mutual life insurance to respondents. The insurer derived economic benefit from those life insurance sales. Ruffin's defalcations related to the life premiums as well as to the health premiums. Thus, Pacific Mutual cannot plausibly claim that Ruffin was acting wholly as an agent of Union when he defrauded respondents.

The details of Ruffin's representation admit of no other conclusion. He gave respondents a single proposal—not multiple ones—for both life and health insurance. He used Pacific Mutual letterhead, which he was authorized to use on Pacific Mutual business. There was, however, no indication that Union was a nonaffiliated company. The trial court found that Ruffin "spoke only of Pacific Mutual and indicated

that Union Fidelity was a subsidiary of Pacific Mutual." App. to Pet. for Cert. A2. Pacific Mutual encouraged the packaging of life and health insurance. Ruffin worked exclusively out of a Pacific Mutual branch office. Each month he presented to the city clerk a single invoice on Pacific Mutual letterhead for both life and health premiums.

Before the frauds in this case were effectuated, Pacific Mutual had received notice that its agent Ruffin was engaged in a pattern of fraud identical to those perpetrated against respondents. There were complaints to the Birmingham office about the absence of coverage purchased through Ruffin. The Birmingham manager was also advised of Ruffin's receipt of noninitial premiums made payable to him, a practice in violation of company policy.

Alabama's common-law rule is that a corporation is liable for both compensatory and punitive damages for the fraud of its employee effected within the scope of his employment. We cannot say that this does not rationally advance the State's interest in minimizing fraud. Alabama long has applied this rule in the insurance context, for it has determined that an insurer is more likely to prevent an agent's fraud if given sufficient financial incentive to do so. See *British General Ins. Co.* v. *Simpson Sales Co.*, 265 Ala. 682, 688, 93 So. 2d 763, 768 (1957).

Imposing exemplary damages on the corporation when its agent commits intentional fraud creates a strong incentive for vigilance by those in a position "to guard substantially against the evil to be prevented." *Louis Pizitz Dry Goods Co.* v. *Yeldell*, 274 U. S. 112, 116 (1927). If an insurer were liable for such damages only upon proof that it was at fault independently, it would have an incentive to minimize oversight of its agents. Imposing liability without independent fault deters fraud more than a less stringent rule. It therefore rationally advances the State's goal. We cannot say this is a violation of Fourteenth Amendment due process. See *American Society of Mechanical Engineers, Inc.* v. *Hydro-*

*level Corp.*, 456 U. S. 556 (1982); *Pizitz*, 274 U. S., at 115. These and other cases in a broad range of civil and criminal contexts make clear that imposing such liability is not fundamentally unfair and does not in itself violate the Due Process Clause. See *Shevlin-Carpenter Co.* v. *Minnesota*, 218 U. S. 57 (1910); *United States* v. *Balint*, 258 U. S. 250, 252 (1922); *United States* v. *Park*, 421 U. S. 658, 670 (1975).

We therefore readily conclude that Ruffin was acting as an employee of Pacific Mutual when he defrauded respondents, and that imposing liability upon Pacific Mutual for Ruffin's fraud under the doctrine of *respondeat superior* does not, on the facts here, violate Pacific Mutual's due process rights.

## V

"Punitive damages have long been a part of traditional state tort law." *Silkwood* v. *Kerr-McGee Corp.*, 464 U. S. 238, 255 (1984). Blackstone appears to have noted their use. 3 W. Blackstone, Commentaries *137–*138. See also *Wilkes* v. *Wood*, Lofft 1, 98 Eng. Rep. 489 (C. P. 1763) (The Lord Chief Justice validating exemplary damages as compensation, punishment, and deterrence). Among the first reported American cases are *Genay* v. *Norris*, 1 Bay 6 (S. C. 1784), and *Coryell* v. *Colbaugh*, 1 N. J. L. 77 (1791).[5]

Under the traditional common-law approach, the amount of the punitive award is initially determined by a jury instructed to consider the gravity of the wrong and the need to deter similar wrongful conduct. The jury's determination is then reviewed by trial and appellate courts to ensure that it is reasonable.

This Court more than once has approved the common-law method for assessing punitive awards. In *Day* v. *Woodworth*, 13 How. 363 (1852), a case decided before the adoption

---

[5] For informative historical comment, see Owen, Punitive Damages in Products Liability Litigation, 74 Mich. L. Rev. 1257, 1262–1264, and nn. 17–23 (1976).

of the Fourteenth Amendment, Justice Grier, writing for a unanimous Court, observed:

> "It is a well-established principle of the common law, that in actions of trespass and all actions on the case for torts, a jury may inflict what are called exemplary, punitive, or vindictive damages upon a defendant, having in view the enormity of his offence rather than the measure of compensation to the plaintiff. We are aware that the propriety of this doctrine has been questioned by some writers; but if repeated judicial decisions for more than a century are to be received as the best exposition of what the law is, the question will not admit of argument. By the common as well as by statute law, men are often punished for aggravated misconduct or lawless acts, by means of a civil action, and the damages, inflicted by way of penalty or punishment, given to the party injured.

> ". . . This has been always left to the discretion of the jury, as the degree of punishment to be thus inflicted must depend on the peculiar circumstances of each case." *Id.*, at 371.

In *Missouri Pacific R. Co.* v. *Humes*, 115 U. S. 512 (1885), the Court stated: "The discretion of the jury in such cases is not controlled by any very definite rules; yet the wisdom of allowing such additional damages to be given is attested by the long continuance of the practice." *Id.*, at 521. See also *Barry* v. *Edmunds*, 116 U. S. 550, 565 (1886) ("For nothing is better settled than that, in such cases as the present, and other actions for torts where no precise rule of law fixes the recoverable damages, it is the peculiar function of the jury to determine the amount by their verdict"); *Minneapolis & St. Louis R. Co.* v. *Beckwith*, 129 U. S. 26, 36 (1889) ("The imposition of punitive or exemplary damages in such cases cannot be opposed as in conflict with the prohibition against the deprivation of property without due process of law. It is only one mode of imposing a penalty for the violation of duty, and its propriety and legality have been recognized . . . by

repeated judicial decisions for more than a century. Its authorization by the law in question . . . cannot therefore be justly assailed as infringing upon the Fourteenth Amendment of the Constitution of the United States"); *Standard Oil Co.* v. *Missouri*, 224 U. S. 270, 285 (1912) ("Nor, from a Federal standpoint, is there any invalidity in the judgment because there was no statute fixing a maximum penalty, no rule for measuring damages, and no hearing"); *Louis Pizitz Dry Goods Co.* v. *Yeldell, supra* (although the issue was raised in the briefs, the Court did not discuss the claim); *Memphis Community School Dist.* v. *Stachura*, 477 U. S. 299, 306, n. 9 (1986). Recently, in *Smith* v. *Wade*, 461 U. S. 30 (1983), this Court affirmed the assessment of punitive damages pursuant to 42 U. S. C. § 1983, where the trial court used the common-law method for determining the amount of the award.[6]

So far as we have been able to determine, every state and federal court that has considered the question has ruled that the common-law method for assessing punitive damages does not in itself violate due process. But see *New Orleans, J. & G. N. R. Co.* v. *Hurst*, 36 Miss. 660 (1859). In view of this consistent history, we cannot say that the common-law method for assessing punitive damages is so inherently unfair as to deny due process and be *per se* unconstitutional. " 'If a thing has been practised for two hundred years by common consent, it will need a strong case for the Fourteenth Amendment to affect it.' " *Sun Oil Co.* v. *Wortman*, 486 U. S. 717, 730 (1988), quoting *Jackman* v. *Rosenbaum Co.*, 260 U. S. 22, 31 (1922). As the Court in *Day* v. *Woodworth*, 13 How. 363 (1852), made clear, the common-law method for assessing punitive damages was well established before the Fourteenth Amendment was enacted. Nothing in that Amendment's

---

[6] Congress by statute in a number of instances has provided for punitive damages. See, *e. g.*, 11 U. S. C. §§ 303(i)(2)(B), 362(h), and 363(n); 12 U. S. C. § 3417(a)(3); 15 U. S. C. §§ 78u(h)(7)(A)(iii), 298(c), 1116(d)(11), and 1681n(2); 26 U. S. C. § 7431(c)(1)(B)(ii); 33 U. S. C. § 1514(c).

text or history indicates an intention on the part of its drafters to overturn the prevailing method. See *Burnham* v. *Superior Court of Cal., County of Marin,* 495 U. S. 604 (1990); *Snyder* v. *Massachusetts,* 291 U. S. 97, 111 (1934) ("The Fourteenth Amendment has not displaced the procedure of the ages").[7]

This, however, is not the end of the matter. It would be just as inappropriate to say that, because punitive damages have been recognized for so long, their imposition is never unconstitutional. See *Williams* v. *Illinois,* 399 U. S. 235, 239 (1970) ("[N]either the antiquity of a practice nor the fact of steadfast legislative and judicial adherence to it through the centuries insulates it from constitutional attack . . ."). We note once again our concern about punitive damages that "run wild." Having said that, we conclude that our task today is to determine whether the Due Process Clause renders the punitive damages award in this case constitutionally unacceptable.

## VI

One must concede that unlimited jury discretion—or unlimited judicial discretion for that matter—in the fixing of punitive damages may invite extreme results that jar one's constitutional sensibilities. See *Waters-Pierce Oil Co.* v. *Texas (No. 1),* 212 U. S. 86, 111 (1909).[8] We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case. We can say, however, that general concerns of reasonableness and adequate guidance from the court when the case is tried to a jury properly enter into the constitutional calculus. With these concerns in mind, we

---

[7] See RAND Institute for Civil Justice, M. Peterson, S. Sarma, & M. Shanley, Punitive Damages—Empirical Findings (1987).

[8] See also Owen, The Moral Foundations of Punitive Damages, 40 Ala. L. Rev. 705, 739 (1989) ("Yet punitive damages are a powerful remedy which itself may be abused, causing serious damage to public and private interests and moral values").

review the constitutionality of the punitive damages awarded in this case.

We conclude that the punitive damages assessed by the jury against Pacific Mutual were not violative of the Due Process Clause of the Fourteenth Amendment. It is true, of course, that under Alabama law, as under the law of most States, punitive damages are imposed for purposes of retribution and deterrence. *Aetna Life Ins. Co.* v. *Lavoie*, 470 So. 2d 1060, 1076 (Ala. 1984). They have been described as quasi-criminal. See *Smith* v. *Wade*, 461 U. S. 30, 59 (1983) (REHNQUIST, J., dissenting). But this in itself does not provide the answer. We move, then, to the points of specific attack.

1. We have carefully reviewed the instructions to the jury. By these instructions, see n. 1, *supra*, the trial court expressly described for the jury the purpose of punitive damages, namely, "not to compensate the plaintiff for any injury" but "to punish the defendant" and "for the added purpose of protecting the public by [deterring] the defendant and others from doing such wrong in the future." App. 105–106. Any evidence of Pacific Mutual's wealth was excluded from the trial in accord with Alabama law. See *Southern Life & Health Ins. Co.* v. *Whitman*, 358 So. 2d 1025, 1026–1027 (Ala. 1978).

To be sure, the instructions gave the jury significant discretion in its determination of punitive damages. But that discretion was not unlimited. It was confined to deterrence and retribution, the state policy concerns sought to be advanced. And if punitive damages were to be awarded, the jury "must take into consideration the character and the degree of the wrong as shown by the evidence and necessity of preventing similar wrong." App. 106. The instructions thus enlightened the jury as to the punitive damages' nature and purpose, identified the damages as punishment for civil wrongdoing of the kind involved, and explained that their imposition was not compulsory.

These instructions, we believe, reasonably accommodated Pacific Mutual's interest in rational decisionmaking and Alabama's interest in meaningful individualized assessment of appropriate deterrence and retribution. The discretion allowed under Alabama law in determining punitive damages is no greater than that pursued in many familiar areas of the law as, for example, deciding "the best interests of the child," or "reasonable care," or "due diligence," or appropriate compensation for pain and suffering or mental anguish.[9] As long as the discretion is exercised within reasonable constraints, due process is satisfied. See, *e. g.*, *Schall* v. *Martin*, 467 U. S. 253, 279 (1984); *Greenholtz* v. *Inmates of Nebraska Penal and Correctional Complex*, 442 U. S. 1, 16 (1979). See also *McGautha* v. *California*, 402 U. S. 183, 207 (1971).

2. Before the trial in this case took place, the Supreme Court of Alabama had established post-trial procedures for scrutinizing punitive awards. In *Hammond* v. *Gadsden*, 493 So. 2d 1374 (1986), it stated that trial courts are "to reflect in the record the reasons for interfering with a jury verdict, or refusing to do so, on grounds of excessiveness of the damages." *Id.*, at 1379. Among the factors deemed "appropriate for the trial court's consideration" are the "culpability of the defendant's conduct," the "desirability of discouraging others from similar conduct," the "impact upon the parties," and "other factors, such as the impact on innocent third parties." *Ibid.* The *Hammond* test ensures meaningful and adequate review by the trial court whenever a jury has fixed the punitive damages.

3. By its review of punitive awards, the Alabama Supreme Court provides an additional check on the jury's or trial

---

[9] The Alabama Legislature recently enacted a statute that places a $250,000 limit on punitive damages in most cases. See 1987 Ala. Acts, No. 87–185, §§ 1, 2, and 4. The legislation, however, became effective only on June 11, 1987, see § 12, after the cause of action in the present case arose and the complaint was filed.

court's discretion. It first undertakes a comparative analysis. See, *e. g., Aetna Life Ins. Co.* v. *Lavoie,* 505 So. 2d 1050, 1053 (1987). It then applies the detailed substantive standards it has developed for evaluating punitive awards.[10] In particular, it makes its review to ensure that the award does "not exceed an amount that will accomplish society's goals of punishment and deterrence." *Green Oil Co.* v. *Hornsby,* 539 So. 2d 218, 222 (1989); *Wilson* v. *Dukona Corp.,* 547 So. 2d 70, 73 (1989). This appellate review makes certain that the punitive damages are reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition.

Also before its ruling in the present case, the Supreme Court of Alabama had elaborated and refined the *Hammond* criteria for determining whether a punitive award is reasonably related to the goals of deterrence and retribution. *Hornsby,* 539 So. 2d, at 223–224; *Central Alabama,* 546 So. 2d, at 376–377. It was announced that the following could be taken into consideration in determining whether the award was excessive or inadequate: (a) whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred; (b) the degree of reprehensibility of the defendant's conduct, the duration of that conduct, the defendant's awareness, any concealment, and the existence and frequency of similar past conduct;

---

[10] See *Central Alabama Electric Cooperative* v. *Tapley,* 546 So. 2d 371, 377–378 (Ala. 1989). This, we feel, distinguishes Alabama's system from the Vermont and Mississippi schemes about which Justices expressed concern in *Browning-Ferris Industries of Vt., Inc.* v. *Kelco Disposal, Inc.,* 492 U. S. 257 (1989), and in *Bankers Life & Casualty Co.* v. *Crenshaw,* 486 U. S. 71 (1988). In those respective schemes, an amount awarded would be set aside or modified only if it was "manifestly and grossly excessive," *Pezzano* v. *Bonneau,* 133 Vt. 88, 91, 329 A. 2d 659, 661 (1974), or would be considered excessive when "it evinces passion, bias and prejudice on the part of the jury so as to shock the conscience," *Bankers Life & Casualty Co.* v. *Crenshaw,* 483 So. 2d 254, 278 (Miss. 1985).

(c) the profitability to the defendant of the wrongful conduct and the desirability of removing that profit and of having the defendant also sustain a loss; (d) the "financial position" of the defendant; (e) all the costs of litigation; (f) the imposition of criminal sanctions on the defendant for its conduct, these to be taken in mitigation; and (g) the existence of other civil awards against the defendant for the same conduct, these also to be taken in mitigation.

The application of these standards, we conclude, imposes a sufficiently definite and meaningful constraint on the discretion of Alabama factfinders in awarding punitive damages. The Alabama Supreme Court's postverdict review ensures that punitive damages awards are not grossly out of proportion to the severity of the offense and have some understandable relationship to compensatory damages. While punitive damages in Alabama may embrace such factors as the heinousness of the civil wrong, its effect upon the victim, the likelihood of its recurrence, and the extent of the defendant's wrongful gain, the factfinder must be guided by more than the defendant's net worth. Alabama plaintiffs do not enjoy a windfall because they have the good fortune to have a defendant with a deep pocket.

These standards have real effect when applied by the Alabama Supreme Court to jury awards. For examples of their application in trial practice, see *Hornsby*, 539 So. 2d, at 219, and *Williams* v. *Ralph Collins Ford-Chrysler, Inc.*, 551 So. 2d 964, 966 (1989). And postverdict review by the Alabama Supreme Court has resulted in reduction of punitive awards. See, *e. g.*, *Wilson* v. *Dukona Corp.*, 547 So. 2d, at 74; *United Services Automobile Assn.* v. *Wade*, 544 So. 2d 906, 917 (1989). The standards provide for a rational relationship in determining whether a particular award is greater than reasonably necessary to punish and deter. They surely are as specific as those adopted legislatively in Ohio Rev. Code

Ann. § 2307.80(B) (Supp. 1989) and in Mont. Code Ann. § 27–1–221 (1989).[11]

Pacific Mutual thus had the benefit of the full panoply of Alabama's procedural protections. The jury was adequately instructed. The trial court conducted a postverdict hearing that conformed with *Hammond*. The trial court specifically found that the conduct in question "evidenced intentional malicious, gross, or oppressive fraud," App. to Pet. for Cert. A14, and found the amount of the award to be reasonable in light of the importance of discouraging insurers from similar conduct, *id.*, at A15. Pacific Mutual also received the benefit of appropriate review by the Supreme Court of Alabama. It applied the *Hammond* standards and approved the verdict thereunder. It brought to bear all relevant factors recited in *Hornsby*.

We are aware that the punitive damages award in this case is more than 4 times the amount of compensatory damages, is more than 200 times the out-of-pocket expenses of respondent Haslip, see n. 2, *supra*, and, of course, is much in excess of the fine that could be imposed for insurance fraud under Ala. Code §§ 13A–5–11 and 13A–5–12(a) (1982), and Ala. Code §§ 27–1–12, 27–12–17, and 27–12–23 (1986). Imprisonment, however, could also be required of an individual in the criminal context. While the monetary comparisons are wide and, indeed, may be close to the line, the award here did not lack objective criteria. We conclude, after careful consider-

---

[11] We have considered the arguments raised by Pacific Mutual and some of its *amici* as to the constitutional necessity of imposing a standard of proof of punitive damages higher than "preponderance of the evidence." There is much to be said in favor of a State's requiring, as many do, see, *e. g.*, Ohio Rev. Code Ann. § 2307.80 (Supp. 1989), a standard of "clear and convincing evidence" or, even, "beyond a reasonable doubt," see Colo. Rev. Stat. § 13–25–127(2) (1987), as in the criminal context. We are not persuaded, however, that the Due Process Clause requires that much. We feel that the lesser standard prevailing in Alabama—"reasonably satisfied from the evidence"—when buttressed, as it is, by the procedural and substantive protections outlined above, is constitutionally sufficient.

ation, that in this case it does not cross the line into the area of constitutional impropriety.[12]   Accordingly, Pacific Mutual's due process challenge must be, and is, rejected.

The judgment of the Supreme Court of Alabama is affirmed.

*It is so ordered.*

JUSTICE SOUTER took no part in the consideration or decision of this case.

JUSTICE SCALIA, concurring in the judgment.

In *Browning-Ferris Industries of Vt., Inc.* v. *Kelco Disposal, Inc.*, 492 U. S. 257 (1989), we rejected the argument that the Eighth Amendment limits punitive damages awards, but left for "another day" the question whether "undue jury discretion to award punitive damages" violates the Due Process Clause of the Fourteenth Amendment, *id.*, at 277.   That day has come, the due process point has been thoroughly briefed and argued, but the Court chooses to decide only that the jury discretion in the present case was not undue.   It says that Alabama's particular procedures (at least as applied here) are not so "unreasonable" as to "cross the line into the area of constitutional impropriety," *ante* this page.   This jury-like verdict provides no guidance as to whether any *other* procedures are sufficiently "reasonable," and thus perpetuates the uncertainty that our grant of certiorari in this case was intended to resolve.   Since it has been the traditional practice of American courts to leave punitive damages (where the evidence satisfies the legal requirements

---

[12] Pacific Mutual also makes what it calls a void-for-vagueness argument and, in support thereof, cites *Giaccio* v. *Pennsylvania*, 382 U. S. 399 (1966).   That case, however, is not helpful.   The Court there struck down a Pennsylvania statute allowing costs to be awarded against a defendant acquitted of a misdemeanor.   The statute did not concern jury discretion in fixing the amount of costs.   Decisions about the appropriate consequences of violating a law are significantly different from decisions as to whether a violation has occurred.

for imposing them) to the discretion of the jury; and since in my view a process that accords with such a tradition and does not violate the Bill of Rights necessarily constitutes "due" process; I would approve the procedure challenged here without further inquiry into its "fairness" or "reasonableness." I therefore concur only in the judgment of the Court.

## I

As the Court notes, punitive or "exemplary" damages have long been a part of Anglo-American law. They have always been controversial. As recently as the mid-19th century, treatise writers sparred over whether they even existed. One respected commentator, Professor Simon Greenleaf, argued that no doctrine of authentically "punitive" damages could be found in the cases; he attempted to explain judgments that ostensibly included punitive damages as in reality no more than full compensation. 2 Law of Evidence 235, n. 2 (13th ed. 1876). This view was not widely shared. In his influential treatise on the law of damages, Theodore Sedgwick stated that "the rule" with respect to the "salutary doctrine" of exemplary damages is that "where gross fraud, malice, or oppression appears, the jury are not bound to adhere to the strict line of compensation, but may, by a severer verdict, at once impose a punishment on the defendant and hold up an example to the community." Measure of Damages 522 (4th ed. 1868). The doctrine, Sedgwick noted, "seems settled in England, and in the general jurisprudence of this country," id., at 35. See also G. Field, Law of Damages 66 (1876) ("[The] doctrine [of punitive damages] seems to be sustained by at least a great preponderance of authorities, both in England and this country"); J. Sutherland, Law of Damages 721–722, 726–727, n. 1 (1882) ("The doctrine that [punitive] damages may be allowed for the purpose of example and punishment, in addition to compensation, in certain cases, is held in nearly all the states of the Union and in England." "Since the time of the controversy between Professor

Greenleaf and Mr. Sedgwick (1847) on this subject, a large majority of the appellate courts in this country have followed the doctrine advocated by Mr. Sedgwick . . .").   In *Day* v. *Woodworth*, 13 How. 363, 371 (1852), this Court observed:

> "It is a well-established principle of the common law, that in actions of trespass and all actions on the case for torts, a jury may inflict what are called exemplary, punitive, or vindictive damages upon a defendant, having in view the enormity of his offence rather than the measure of compensation to the plaintiff.   We are aware that the propriety of this doctrine has been questioned by some writers; but if repeated judicial decisions for more than a century are to be received as the best exposition of what the law is, the question will not admit of argument."

Even fierce opponents of the doctrine acknowledged that it was a firmly established feature of American law.   Justice Foster of the New Hampshire Supreme Court, in a lengthy decision disallowing punitive damages, called them "a perversion of language and ideas so ancient and so common as seldom to attract attention," *Fay* v. *Parker*, 53 N. H. 342, 343 (1873).   The opinion concluded, with more passion than even petitioner in the present case could muster:

> "Undoubtedly this pernicious doctrine has become so fixed in the law . . . that it may be *difficult* to get rid of it.   But it is the business of courts to deal with difficulties; and this heresy should be taken in hand without favor, firmly and fearlessly.
>
> ". . . [N]ot reluctantly should we apply the knife to this deformity, concerning which every true member of the sound and healthy body of the law may well exclaim—'I have no need of thee.'" *Id.*, at 397 (internal quotation marks omitted).

In 1868, therefore, when the Fourteenth Amendment was adopted, punitive damages were undoubtedly an established part of the American common law of torts.   It is just as clear

that no particular procedures were deemed necessary to circumscribe a jury's discretion regarding the award of such damages, or their amount. As this Court noted in *Barry* v. *Edmunds*, 116 U. S. 550, 565 (1886), "nothing is better settled than that, in cases such as the present, and other actions for torts where no precise rule of law fixes the recoverable damages, it is the peculiar function of the jury to determine the amount by their verdict." See also *Missouri Pacific R. Co.* v. *Humes*, 115 U. S. 512, 521 (1885) ("The discretion of the jury in such cases is not controlled by any very definite rules"). Commentators confirmed that the imposition of punitive damages was not thought to require special procedural safeguards, other than—at most—some review by the trial court. "[I]n cases proper for exemplary damages, it would seem impracticable to set any bounds to the discretion of the jury, though in cases where the wrong done, though with malicious intent, is greatly disproportioned to the amount of the verdict, the court may exercise the power it always possesses to grant a new trial for excessive damages." Sedgwick, *supra*, at 537–538, n. 1. See also Field, *supra*, at 65 ("[T]he amount of damages by way of punishment or example, are necessarily largely within the discretion of the jury; the only check . . . being the power of the court to set aside the verdict where it is manifest that the jury were unduly influenced by passion, prejudice, partiality, or corruption, or where it clearly evinces a mistake of the law or the facts of the case"); Sutherland, *supra*, at 742 ("Whether [punitive damages] shall be allowed, and their amount, are left to the discretion of the jury, but subject to the power of the court to set aside the verdict if it is so excessive that the court may infer that the jury have been influenced by passion or prejudice" (footnote omitted)).

Although both the majority and the dissenting opinions today concede that the common-law system for awarding punitive damages is firmly rooted in our history, both reject the proposition that this is dispositive for due process purposes.

*Ante*, at 17–18; *post*, at 60.  I disagree.  In my view, it is not for the Members of this Court to decide from time to time whether a process approved by the legal traditions of our people is "due" process, nor do I believe such a rootless analysis to be dictated by our precedents.

## II

Determining whether common-law procedures for awarding punitive damages can deny "due process of law" requires some inquiry into the meaning of that majestic phrase.  Its first prominent use appears to have been in an English statute of 1354: "[N]o man of what estate or condition that he be, shall be put out of land or tenement, nor taken nor imprisoned, nor disinherited, nor put to death, without being brought in answer by due process of the law."  28 Edw. III, ch. 3.  Although historical evidence suggests that the word "process" in this provision referred to specific writs employed in the English courts (a usage retained in the phrase "service of process"), see Jurow, Untimely Thoughts: A Reconsideration of the Origins of Due Process of Law, 19 Am. J. Legal Hist. 265, 272–275 (1975), Sir Edward Coke had a different view.  In the second part of his Institutes, see 2 Institutes 50 (5th ed. 1797), Coke equated the phrase "due process of the law" in the 1354 statute with the phrase "Law of the Land" in Chapter 29 of Magna Charta (Chapter 39 of the original Magna Charta signed by King John at Runnymede in 1215), which provides: "No Freeman shall be taken, or imprisoned, or be disseised of his Freehold, or Liberties, or free Customs, or be outlawed, or exiled, or any otherwise destroyed; nor will we not pass upon him, nor condemn him, but by lawful Judgment of his Peers, or by the Law of the Land."  9 Hen. III, ch. 29 (1225).  In Coke's view, the phrase "due process of law" referred to the customary procedures to which freemen were entitled by "the old law of England," 2 Institutes 50.

The American colonists were intimately familiar with Coke, see R. Mott, Due Process of Law 87–90, 107 (1926); A. Howard, The Road from Runnymede: Magna Carta and Constitutionalism in America 117–125 (1968), and when, in their Constitutions, they widely adopted Magna Charta's "law of the land" guarantee, see, *e. g.*, N. C. Const., Art. XII (1776) ("[N]o freeman ought to be taken, imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed, or deprived of his life, liberty, or property, but by the law of the land"); Mass. Const., Art. XII (1780) ("[N]o subject shall be arrested, imprisoned, despoiled, or deprived of his property, immunities, or privileges, put out of the protection of the law, exiled or deprived of his life, liberty, or estate, but by the judgment of his peers, or the law of the land"), they almost certainly understood it as Coke did. It was thus as a supposed affirmation of Magna Charta according to Coke that the First Congress (without recorded debate on the issue) included in the proposed Fifth Amendment to the Federal Constitution the provision that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." Early commentaries confirm this. See, *e. g.*, 2 W. Blackstone, Commentaries 133, nn. 11, 12 (S. Tucker ed. 1803); 2 J. Kent, Commentaries on American Law 10 (1827); 3 J. Story, Commentaries on the Constitution of the United States 661 (1833).

This Court did not engage in any detailed analysis of the Due Process Clause until *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272 (1856). That case involved the validity of a federal statute authorizing the issuance of distress warrants, a mechanism by which the Government collected debts without providing the debtor notice or an opportunity for hearing. The Court noted that the words "due process of law" conveyed "the same meaning as the words 'by the law of the land,' in *Magna Charta*" (referring to Coke's commentary and early State Constitutions), and that

they were "a restraint on the legislature as well as on the executive and judicial powers of the government," *id.*, at 276. This brought the Court to the critical question:

> "To what principles, then, are we to resort to ascertain whether this process enacted by congress, is due process? To this the answer must be twofold. We must examine the constitution itself, to see whether this process be in conflict with any of its provisions. If not found to be so, we must look to those settled usages and modes of proceeding existing in the common and statute law of England, before the emigration of our ancestors, and which are shown not to have been unsuited to their civil and political condition by having been acted on by them after the settlement of this country." *Id.*, at 276–277.

Reviewing the history of the distress warrant, the Court concluded that the procedure could not deny due process of law because "there has been no period, since the establishment of the English monarchy, when there has not been, by the law of the land, a summary method for the recovery of debts due to the crown, and especially those due from receivers of the revenues," *id.*, at 277, and these summary procedures had been replicated, with minor modifications, in the laws of the various American colonies and, after independence, the States, *id.*, at 278–280.

Subsequent to the decision in *Murray's Lessee*, of course, the Fourteenth Amendment was adopted, adding another Due Process Clause to the Constitution. The Court soon reaffirmed the teaching of *Murray's Lessee* under the new provision:

> "A State cannot deprive a person of his property without due process of law; but this does not necessarily imply that all trials in the State courts affecting the property of persons must be by jury. This requirement of the Constitution is met *if the trial is had according to the settled course of judicial proceedings*. Due process of law is

process due according to the law of the land." *Walker* v. *Sauvinet*, 92 U. S. 90, 92–93 (1876) (emphasis added; citation omitted).

Not until *Hurtado* v. *California*, 110 U. S. 516 (1884), however, did the Court significantly elaborate upon the historical test for due process advanced in *Murray's Lessee*. In that case, a man convicted of murder in California contended that the State had denied him due process of law by omitting grand-jury indictment. Relying upon *Murray's Lessee*, he argued that because that procedure was firmly rooted in the Anglo-American common-law tradition, it was an *indispensable* element of due process. The Court disagreed.

> "The real syllabus of [the relevant portion of *Murray's Lessee*] is, that a process of law, which is not otherwise forbidden, must be taken to be due process of law, if it can show the sanction of settled usage both in England and in this country; but it by no means follows that nothing else can be due process of law. The point in the case cited arose in reference to a summary proceeding, questioned on that account, as not due process of law. The answer was: however exceptional it may be, as tested by definitions and principles of ordinary procedure, nevertheless, this, in substance, has been immemorially the actual law of the land, and, therefore, is due process of law. But to hold that such a characteristic is essential to due process of law, would be to deny every quality of the law but its age, and to render it incapable of progress or improvement. It would be to stamp upon our jurisprudence the unchangeableness attributed to the laws of the Medes and Persians." *Hurtado* v. *California, supra,* at 528–529.

*Hurtado*, then, clarified the proper role of history in a due process analysis: If the government chooses to *follow* a historically approved procedure, it necessarily *provides* due process, but if it chooses to *depart* from historical practice, it

does not necessarily *deny* due process. The remaining business, of course, was to develop a test for determining *when* a departure from historical practice denies due process. *Hurtado* provided scant guidance. It merely suggested that due process could be assessed in such cases by reference to "those *fundamental principles of liberty and justice* which lie at the base of all our civil and political institutions," 100 U. S., at 535 (emphasis added).

The concept of "fundamental justice" thus entered the due process lexicon not as a description of what due process entails in general, but as a description of what it entails when traditional procedures are dispensed with. As the Court reiterated in *Twining* v. *New Jersey*, 211 U. S. 78 (1908), "consistently with the requirements of due process, no *change* in ancient procedure can be made which disregards those *fundamental principles*, to be ascertained from time to time by judicial action, which have relation to process of law and protect the citizen in his private right, and guard him against the arbitrary action of government." *Id.*, at 101 (emphasis added). See also *Maxwell* v. *Dow*, 176 U. S. 581, 602–605 (1900) (eight-member jury does not violate due process because it is not "a denial of fundamental rights").[1]

*Ownbey* v. *Morgan*, 256 U. S. 94 (1921), provides a classic expression of the Court's "settled usage" doctrine. The Delaware statute challenged in that case provided that a creditor could attach the in-state property of an out-of-state debtor and recover against it without the debtor's being given an opportunity to be heard unless he posted a bond. This procedure could be traced back to 18th-century London, and had been followed in Delaware and other States since colonial days. The Court acknowledged that in general the due proc-

---

[1] During the late 19th century the Court also advanced the view that laws departing from *substantive* common law might violate due process if they denied "fundamental" rights. See, *e. g., Allgeyer* v. *Louisiana*, 165 U. S. 578, 589 (1897). The present analysis deals only with the Court's so-called "procedural" due process jurisprudence.

ess guarantee "includ[es] the right to be heard where liberty or property is at stake in judicial proceedings." *Id.*, at 111. But, it said, "[a] procedure customarily employed, long before the Revolution, in the commercial metropolis of England, and generally adopted by the States as suited to their circumstances and needs, cannot be deemed inconsistent with due process of law." *Ibid.*

> "The due process clause does not impose upon the States a duty to establish ideal systems for the administration of justice, with every modern improvement and with provision against every possible hardship that may befall. . . .
>
> "However desirable it is that the old forms of procedure be improved with the progress of time, it cannot rightly be said that the Fourteenth Amendment furnishes a universal and self-executing remedy. Its function is negative, not affirmative, and it carries no mandate for particular measures of reform." *Id.*, at 110–112.

See also *Corn Exchange Bank* v. *Coler*, 280 U. S. 218, 222–223 (1930).

By the time the Court decided *Snyder* v. *Massachusetts*, 291 U. S. 97 (1934), its understanding of due process had shifted in a subtle but significant way. That case rejected a criminal defendant's claim that he had been denied due process by being prevented from accompanying his jury on a visit to the scene of the crime. Writing for the Court, Justice Cardozo assumed that due process required "fundamental justice," *id.*, at 108, or "fairness," see *id.*, at 116, in *all* cases, and not merely when evaluating nontraditional procedures. The opinion's analysis began from the premise that "Massachusetts is free to regulate the procedure of its courts in accordance with its own conception of policy and fairness *unless in so doing it offends some principle of justice so rooted in the traditions and conscience of our people to be ranked as fundamental." Id.*, at 105 (emphasis added). Even so,

however, only the mode of analysis and not the content of the Due Process Clause had changed, since in assessing whether some principle of "fundamental justice" had been violated, the Court was willing to accord historical practice dispositive weight. Justice Cardozo noted that the practice of showing evidence to the jury outside the presence of the defendant could be traced back to 18th-century England, and had been widely adopted in the States. "The Fourteenth Amendment," he wrote, "has not displaced the procedure of the ages." *Id.*, at 111.

In the ensuing decades, however, the concept of "fundamental fairness" under the Fourteenth Amendment became increasingly decoupled from the traditional historical approach. The principal mechanism for that development was the incorporation within the Fourteenth Amendment of the Bill of Rights guarantees. Although the Court resisted for some time the idea that "fundamental fairness" necessarily included the protections of the Bill of Rights, see, *e. g.*, *Adamson* v. *California*, 332 U. S. 46, 54–58 (1947); *Betts* v. *Brady*, 316 U. S. 455, 462 (1942); *Palko* v. *Connecticut*, 302 U. S. 319, 323–325 (1937), it ultimately incorporated virtually all of them, see, *e. g.*, *Malloy* v. *Hogan*, 378 U. S. 1, 4–6 (1964); *Gideon* v. *Wainwright*, 372 U. S. 335, 341–345 (1963). Of course, most of the procedural protections of the Federal Bill of Rights simply codified traditional common-law privileges and had been widely adopted by the States. See *Robertson* v. *Baldwin*, 165 U. S. 275, 281 (1897) ("The law is perfectly well settled that the first ten amendments to the Constitution, commonly known as the Bill of Rights, were not intended to lay down any novel principles of government, but simply to embody certain guaranties and immunities which we had inherited from our English ancestors"); T. Cooley, Constitutional Limitations, ch. X (4th ed. 1878). However, in the days when they were deemed to apply only to the Federal Government and not to impose uniformity upon the States, the Court had interpreted several provisions

of the Bill of Rights in a way that departed from their strict common-law meaning. Thus, by the mid-20th century there had come to be some considerable divergence between historical practice followed by the States and the guarantees of the Bill of Rights. *Gideon, supra,* established that no matter how strong its historical pedigree, a procedure prohibited by the Sixth Amendment (failure to appoint counsel in certain criminal cases) violates "fundamental fairness" and must be abandoned by the States. *Id.,* at 342–345.

To say that unbroken historical usage cannot save a procedure that violates one of the explicit procedural guarantees of the Bill of Rights (applicable through the Fourteenth Amendment) is not necessarily to say that such usage cannot demonstrate the procedure's compliance with the more general guarantee of "due process." In principle, what is important enough to have been included within the Bill of Rights has good claim to being an element of "fundamental fairness," whatever history might say; and as a practical matter, the invalidation of traditional state practices achievable through the Bill of Rights is at least limited to enumerated subjects. But disregard of "the procedure of the ages" for incorporation purposes has led to its disregard more generally. There is irony in this, since some of those who most ardently supported the incorporation doctrine did so in the belief that it was a means of avoiding, rather than producing, a subjective due-process jurisprudence. See, for example, the dissent of Justice Black, author of *Gideon,* from the Court's refusal to replace "fundamental fairness" with the Bill of Rights as the *sole* test of due process:

> "[T]he 'natural law' formula which the Court uses to reach its conclusion in this case should be abandoned as an incongruous excrescence on our Constitution. I believe that formula to be itself a violation of our Constitution, in that it subtly conveys to courts, at the expense of legislatures, ultimate power over public policies in fields where no specific provision of the Constitution lim-

its legislative power." *Adamson, supra,* at 75 (Black, J., dissenting).

In any case, our due process opinions in recent decades have indiscriminately applied balancing analysis to determine "fundamental fairness," without regard to whether the procedure under challenge was (1) a traditional one and, if so, (2) prohibited by the Bill of Rights. See, *e. g., Ake* v. *Oklahoma,* 470 U. S. 68, 76–87 (1985); *Lassiter* v. *Department of Social Services of Durham Cty.,* 452 U. S. 18, 24–25 (1981); *Mathews* v. *Eldridge,* 424 U. S. 319, 332–335 (1976). Even so, however, very few cases have used the Due Process Clause, without the benefit of an accompanying Bill of Rights guarantee, to strike down a procedure concededly approved by traditional and continuing American practice. Most notably, in *Sniadach* v. *Family Finance Corp. of Bay View,* 395 U. S. 337, 340 (1969), over the strenuous dissent of Justice Black, the Court declared unconstitutional the garnishment of wages, saying that "[t]he fact that a procedure would pass muster under a feudal regime does not mean it gives necessary protection to all property in its modern forms." And in *Shaffer* v. *Heitner,* 433 U. S. 186 (1977), the Court invalidated general *quasi in rem* jurisdiction, saying that "'traditional notions of fair play and substantial justice' can be as readily offended by the perpetuation of ancient forms that are no longer justified as by the adoption of new procedures that are inconsistent with the basic values of our constitutional heritage," *id.,* at 212. Such cases, at least in their broad pronouncements if not with respect to the particular provisions at issue,[2] were in my view wrongly decided.

---

[2] In *Shaffer,* JUSTICE STEVENS' concurrence noted that Delaware was the only State that currently exercised *quasi in rem* jurisdiction in the manner there at issue, viz., on the basis of ownership of stock in a state-chartered corporation, when both owner and custodian of the stock resided elsewhere. See 433 U. S., at 218 (opinion concurring in judgment). It seems not to have been asserted, moreover, that that manner of exercise had *ever* been a common and established American practice.

I might, for reasons of *stare decisis*, adhere to the principle that these cases announce, except for the fact that our later cases give it nothing but lipservice, and by their holdings reaffirm the view that traditional practice (unless contrary to the Bill of Rights) is conclusive of "fundamental fairness." As I wrote last Term in *Burnham* v. *Superior Court of Cal., County of Marin*, 495 U. S. 604, 623–625 (1990), nothing but the conclusiveness of history can explain why jurisdiction based upon mere service of process within a State—either generally or on the precise facts of that case—is "fundamentally fair." Nor to my mind can anything else explain today's decision that a punishment whose assessment and extent are committed entirely to the discretion of the jury is "fundamentally fair." The Court relies upon two inconsequential factors. First, the "guidance" to the jury provided by the admonition that it "take into consideration the character and the degree of the wrong as shown by the evidence and necessity of preventing similar wrong." That is not guidance but platitude. Second, review of the *amount* of the verdict by the trial and appellate courts, which are also governed by no discernible standard except what they have done in other cases (unless, presumably, they announce a change). But it would surely not be considered "fair" (or in accordance with due process) to follow a similar procedure outside of this historically approved context—for example, to dispense with meaningful guidance concerning *compensatory* damages, so long as whatever number the jury picks out of the air can be reduced by the trial judge or on appeal. I can conceive of no test relating to "fairness" in the abstract that would approve this procedure, unless it is whether something even more unfair could be imagined. If the imposition of millions of dollars of liability in this hodge-podge fashion fails to "jar [the Court's] constitutional sensibilities," *ante*, at 18, it is hard to say what would.

When the rationale of earlier cases *(Sniadach* and *Shaffer)* is contradicted by later holdings—and particularly when that

rationale has no basis in constitutional text and itself contradicts opinions never explicitly overruled—I think it has no valid *stare decisis* claim upon me. Our holdings remain in conflict, no matter which course I take. I choose, then, to take the course that accords with the language of the Constitution and with our interpretation of it through the first half of this century. I reject the principle, aptly described and faithfully followed in JUSTICE O'CONNOR's dissent, that a traditional procedure of our society becomes unconstitutional whenever the Members of this Court "lose . . . confidence" in it, *post*, at 63. And like Justice Cardozo in *Snyder*, I affirm that no procedure firmly rooted in the practices of our people can be so "fundamentally unfair" as to deny due process of law.

Let me be clear about the scope of the principle I am applying. It does not say that every practice sanctioned by history is constitutional. It does not call into question, for example, the case of *Williams* v. *Illinois*, 399 U. S. 235 (1970), relied upon by both the majority and the dissent, where we held unconstitutional the centuries-old practice of permitting convicted criminals to reduce their prison sentences by paying fines. The basis of that invalidation was not denial of due process but denial to indigent prisoners of equal protection of the laws. The Equal Protection Clause and other provisions of the Constitution, unlike the Due Process Clause, are not an explicit invocation of the "law of the land," and might be thought to have some counterhistorical content. Moreover, the principle I apply today does not reject our cases holding that procedures demanded by the Bill of Rights—which extends against the States only *through* the Due Process Clause—must be provided despite historical practice to the contrary. Thus, it does not call into question the proposition that punitive damages, despite their historical sanction, can violate the First Amendment. See, *e. g.*, *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323, 349–350

(1974) (First Amendment prohibits awards of punitive damages in certain defamation suits).

\* \* \*

A harsh or unwise procedure is not necessarily unconstitutional, *Corn Exchange Bank*, 280 U. S., at 223, just as the most sensible of procedures may well violate the Constitution, see *Maryland* v. *Craig*, 497 U. S. 836, 860–861 (1990) (SCALIA, J., dissenting). State legislatures and courts have the power to restrict or abolish the common-law practice of punitive damages, and in recent years have increasingly done so. See, *e. g.*, Alaska Stat. Ann. § 09.17.020 (Supp. 1990) (punitive damages must be supported by "clear and convincing evidence"); Fla. Stat. § 768.73(1)(a) (1989) (in specified classes of cases, punitive damages are limited to three times the amount of compensatory damages); Va. Code Ann. § 8.01–38.1 (Supp. 1990) (punitive damages limited to $350,000). It is through those means—State by State, and, at the federal level, by Congress—that the legal procedures affecting our citizens are improved. Perhaps, when the operation of that process has purged a historically approved practice from our national life, the Due Process Clause would permit this Court to announce that it is no longer in accord with the law of the land. But punitive damages assessed under common-law procedures are far from a fossil, or even an endangered species. They are (regrettably to many) vigorously alive. To effect their elimination may well be wise, but is not the role of the Due Process Clause. "Its function is negative, not affirmative, and it carries no mandate for particular measures of reform." *Ownbey*, 256 U. S., at 112.

We have expended much ink upon the due-process implications of punitive damages, and the fact-specific nature of the Court's opinion guarantees that we and other courts will expend much more in the years to come. Since jury-assessed punitive damages are a part of our living tradition that dates

back prior to 1868, I would end the suspense and categorically affirm their validity.

JUSTICE KENNEDY, concurring in the judgment.

Historical acceptance of legal institutions serves to validate them not because history provides the most convenient rule of decision but because we have confidence that a long-accepted legal institution would not have survived if it rested upon procedures found to be either irrational or unfair. For this reason, JUSTICE SCALIA's historical approach to questions of procedural due process has much to commend it. I cannot say with the confidence maintained by JUSTICE SCALIA, however, that widespread adherence to a historical practice always forecloses further inquiry when a party challenges an ancient institution or procedure as violative of due process. But I agree that the judgment of history should govern the outcome in the case before us. Jury determination of punitive damages has such long and principled recognition as a central part of our system that no further evidence of its essential fairness or rationality ought to be deemed necessary.

Our legal tradition is one of progress from fiat to rationality. The evolution of the jury illustrates this principle. From the 13th or 14th century onward, the verdict of the jury found gradual acceptance not as a matter of *ipse dixit*, the basis for verdicts in trials by ordeal which the jury came to displace, but instead because the verdict was based upon rational procedures. See T. Plucknett, A Concise History of the Common Law 120–131 (5th ed. 1956). Elements of whim and caprice do not predominate when the jury reaches a consensus based upon arguments of counsel, the presentation of evidence, and instructions from the trial judge, subject to review by the trial and appellate courts. There is a principled justification too in the composition of the jury, for its representative character permits its verdicts to express the sense of the community.

Some inconsistency of jury results can be expected for at least two reasons. First, the jury is empaneled to act as a decisionmaker in a single case, not as a more permanent body. As a necessary consequence of their case-by-case existence, juries may tend to reach disparate outcomes based on the same instructions. Second, the generality of the instructions may contribute to a certain lack of predictability. The law encompasses standards phrased at varying levels of generality. As with other adjudicators, the jury may be instructed to follow a rule of certain and specific content in order to yield uniformity at the expense of considerations of fairness in the particular case; or, as in this case, the standard can be more abstract and general to give the adjudicator flexibility in resolving the dispute at hand.

These features of the jury system for assessing punitive damages discourage uniform results, but nonuniformity cannot be equated with constitutional infirmity. As we have said in the capital sentencing context:

"It is not surprising that such collective judgments often are difficult to explain. But the inherent lack of predictability of jury decisions does not justify their condemnation. On the contrary, it is the jury's function to make the difficult and uniquely human judgments that defy codification and that 'buil[d] discretion, equity, and flexibility into a legal system.'" *McCleskey* v. *Kemp*, 481 U. S. 279, 311 (1987) (quoting H. Kalven & H. Zeisel, The American Jury 498 (1966)).

This is not to say that every award of punitive damages by a jury will satisfy constitutional norms. A verdict returned by a biased or prejudiced jury no doubt violates due process, and the extreme amount of an award compared to the actual damage inflicted can be some evidence of bias or prejudice in an appropriate case. One must recognize the difficulty of making the showing required to prevail on this theory. In my view, however, it provides firmer guidance and rests on sounder jurisprudential foundations than does the approach

espoused by the majority. While seeming to approve the common-law method for assessing punitive damages, *ante*, at 17–18, the majority nevertheless undertakes a detailed examination of that method as applied in the case before us, *ante*, at 18–24. It is difficult to comprehend on what basis the majority believes the common-law method might violate due process in a particular case after it has approved that method as a general matter, and this tension in its analysis now must be resolved in some later case.

In my view, the principles mentioned above and the usual protections given by the laws of the particular State must suffice until judges or legislators authorized to do so initiate system-wide change. We do not have the authority, as do judges in some of the States, to alter the rules of the common law respecting the proper standard for awarding punitive damages and the respective roles of the jury and the court in making that determination. Were we sitting as state-court judges, the size and recurring unpredictability of punitive damages awards might be a convincing argument to reconsider those rules or to urge a reexamination by the legislative authority. We are confined in this case, however, to interpreting the Constitution, and from this perspective I agree that we must reject the arguments advanced by petitioner.

For these reasons I concur in the judgment of the Court.

JUSTICE O'CONNOR, dissenting.

Punitive damages are a powerful weapon. Imposed wisely and with restraint, they have the potential to advance legitimate state interests. Imposed indiscriminately, however, they have a devastating potential for harm. Regrettably, common-law procedures for awarding punitive damages fall into the latter category. States routinely authorize civil juries to impose punitive damages without providing them any meaningful instructions on how to do so. Rarely is a jury told anything more specific than "do what you think best." See *Browning-Ferris Industries of Vt., Inc.* v. *Kelco Disposal, Inc.*, 492 U. S. 257, 281 (1989) (Brennan, J., concurring).

In my view, such instructions are so fraught with uncertainty that they defy rational implementation. Instead, they encourage inconsistent and unpredictable results by inviting juries to rely on private beliefs and personal predilections. Juries are permitted to target unpopular defendants, penalize unorthodox or controversial views, and redistribute wealth. Multimillion dollar losses are inflicted on a whim. While I do not question the general legitimacy of punitive damages, I see a strong need to provide juries with standards to constrain their discretion so that they may exercise their power wisely, not capriciously or maliciously. The Constitution requires as much.

The Court today acknowledges that dangers may lurk, but holds that they did not materialize in this case. See *ante,* at 18–24. They did materialize, however. They always do, because such dangers are part and parcel of common-law punitive damages procedures. As is typical, the trial court's instructions in this case provided no meaningful standards to guide the jury's decision to impose punitive damages or to fix the amount. Accordingly, these instructions were void for vagueness. Even if the Court disagrees with me on this point, it should still find that Pacific Mutual was denied procedural due process. Whether or not the jury instructions were so vague as to be unconstitutional, they plainly offered less guidance than is required under the due process test set out in *Mathews* v. *Eldridge,* 424 U. S. 319, 335 (1976). The most modest of procedural safeguards would have made the process substantially more rational without impairing any legitimate governmental interest. The Court relies heavily on the State's mechanism for postverdict judicial review, *ante,* at 20–23, but this is incapable of curing a grant of standardless discretion to the jury. *Post hoc* review tests only the amount of the award, not the procedures by which that amount was determined. Alabama's common-law scheme is so lacking in fundamental fairness that the propriety of any specific award is irrelevant. *Any* award of punitive damages

rendered under these procedures, no matter how small the amount, is constitutionally infirm.

Notwithstanding its recognition of serious due process concerns, the Court upholds Alabama's punitive damages scheme. Unfortunately, Alabama's punitive damages scheme is indistinguishable from the common-law schemes employed by many States. The Court's holding will therefore substantially impede punitive damages reforms. Because I am concerned that the Court today sends the wrong signal, I respectfully dissent.

I

Due process requires that a State provide meaningful standards to guide the application of its laws. See *Kolender* v. *Lawson*, 461 U. S. 352, 358 (1983). A state law that lacks such standards is void for vagueness. The void-for-vagueness doctrine applies not only to laws that proscribe conduct, but also to laws that vest standardless discretion in the jury to fix a penalty. See *United States* v. *Batchelder*, 442 U. S. 114, 123 (1979). I have no trouble concluding that Alabama's common-law scheme for imposing punitive damages is void for vagueness.

A

Alabama's punitive damages scheme requires a jury to make two decisions: (1) whether or not to impose punitive damages against the defendant, and (2) if so, in what amount. On the threshold question of whether or not to impose punitive damages, the trial court instructed the jury as follows: "Imposition of punitive damages is *entirely discretionary* with the jury, that means you don't have to award it unless this jury *feels* that you should do so." App. 105–106 (emphasis added).

This instruction is as vague as any I can imagine. It speaks of discretion, but suggests *no* criteria on which to base the exercise of that discretion. Instead of reminding the jury that its decision must rest on a factual or legal predicate, the instruction suggests that the jury may do whatever

it "feels" like.   It thus invites individual jurors to rely upon emotion, bias, and personal predilections of every sort.   As I read the instruction, it as much permits a determination based upon the toss of a coin or the color of the defendant's skin as upon a reasoned analysis of the offensive conduct. This is not "discretion in the legal sense of that term, but . . . mere will.   It is purely arbitrary and acknowledges neither guidance nor restraint."   *Yick Wo* v. *Hopkins*, 118 U. S. 356, 366–367 (1886).

*Giaccio* v. *Pennsylvania*, 382 U. S. 399 (1966), offers a compelling analogy.   At issue in *Giaccio* was a statute that left to the discretion of the jury whether or not to assess costs against an acquitted criminal defendant.   The statute did not set out any standards to guide the jury's determination.   *Id.*, at 401.   The Court did not hesitate in striking down the statute on vagueness grounds.   *Id.*, at 402.   It reasoned that the utter lack of standards subjected acquitted defendants to "arbitrary and discriminatory impositions of costs."   *Ibid.*   Justice Black wrote for the Court:

> "The Act, without imposing a single condition, limitation or contingency on a jury which has acquitted a defendant simply says the jurors 'shall determine, by their verdict, whether . . . the defendant, shall pay the costs' . . . . Certainly one of the basic purposes of the Due Process Clause has always been to protect a person against having the Government impose burdens upon him except in accordance with the valid laws of the land.   Implicit in this constitutional safeguard is the premise that the law must be one that carries an understandable meaning with legal standards that courts must enforce.   This state Act as written does not even begin to meet this constitutional requirement."   *Id.*, at 403.

Alabama's common-law punitive damages scheme fails for precisely the same reason.   It permits a jury to decide whether or not to impose punitive damages "without imposing a single condition, limitation or contingency" on the jury.

*Ibid.* The State offers no principled basis for distinguishing those tortfeasors who should be liable for punitive damages from those who should not be liable. Instead, the State delegates this basic policy matter to individual juries "for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned* v. *City of Rockford,* 408 U. S. 104, 108–109 (1972). As in *Giaccio,* this grant of unchanneled, standardless discretion "does not even begin to meet th[e] constitutional requirement." *Giaccio,* 382 U. S., at 403.

The vagueness question is not even close. This is not a case where a State has ostensibly provided a standard to guide the jury's discretion. Alabama, making no pretensions whatsoever, gives civil juries complete, unfettered, and unchanneled discretion to determine whether or not to impose punitive damages. Not only that, the State *tells* the jury that it has complete discretion. This is a textbook example of the void-for-vagueness doctrine. Alabama's common-law scheme is unconstitutionally vague because the State entrusts the jury with "such broad and unlimited power . . . that the jurors must make determinations of the crucial issue upon their notions of what the law should be instead of what it is." *Ibid.*

If anything, this is an easier case than *Giaccio.* There, the Court struck down on vagueness grounds a Pennsylvania law, under which the monetary penalty that could be assessed by the jury against the defendant was limited to the costs of prosecution—in that case, $230.95. *Id.,* at 400. Our scrutiny under the vagueness doctrine intensifies, however, in proportion to the severity of the penalty imposed, see *Hoffman Estates* v. *The Flipside, Hoffman Estates, Inc.,* 455 U. S. 489, 498–499 (1982), and Alabama's punitive damages scheme places no substantive limits on the amount of a jury's award. Pacific Mutual was found liable for punitive damages of $840,000. *Ante,* at 7, n. 2. Even this substantial sum pales by comparison to others handed down by juries

in the State. See App. to Brief for Alabama Defense Lawyers Association as *Amicus Curiae* 1a–19a (listing Alabama jury verdicts including punitive damages awards as high as $10 million, $25 million, and $50 million).

It is no defense to vagueness that this case concerns a jury instruction rather than a statute. The constitutional prohibition against vagueness does not disappear simply because the state law at issue originated in the courts rather than the legislature. "[I]f anything, our scrutiny of awards made without the benefit of a legislature's deliberation and guidance would be less indulgent than our consideration of those that fall within statutory limits." *Browning-Ferris*, 492 U. S., at 281 (Brennan, J., concurring). See *ante*, at 20–22. Moreover, the instruction in this case was not an aberration. It tracked virtually word for word Alabama's Pattern Jury Instruction on punitive damages. See Alabama Pattern Jury Instructions, Civil 11.03 (1974).

Nor does it matter that punitive damages are imposed by civil juries rather than criminal courts. The vagueness doctrine is not limited to criminal penalties. See *Hoffman Estates, supra; City of Mesquite* v. *Aladdin's Castle, Inc.*, 455 U. S. 283 (1982). The Court in *Giaccio* expressly repudiated this distinction:

> "Both liberty and property are specifically protected by the Fourteenth Amendment against any state deprivation which does not meet the standards of due process, and this protection is not to be avoided by the simple label a State chooses to fasten upon its conduct or its statute. So here this state Act whether labeled 'penal' or not must meet the challenge that it is unconstitutionally vague." 382 U. S., at 402.

Here, as in *Giaccio*, the civil/criminal distinction is blurry. Unlike compensatory damages, which are purely civil in character, punitive damages are, by definition, punishment. They operate as "private fines levied by civil juries" to advance governmental objectives. *Gertz* v. *Robert Welch, Inc.*,

418 U. S. 323, 350 (1974). Because Alabama permits juries to inflict these potentially devastating penalties wholly at random, the State scheme is void for vagueness.

## B

If an Alabama jury determines that punitive damages are appropriate in a particular case, it must then fix the amount. Here, the trial court instructed the jury: "Should you award punitive damages, in fixing the amount, you must take into consideration the character and the degree of the wrong as shown by the evidence and [the] necessity of preventing similar wrong." App. 106.

The Court concludes that this instruction sufficiently limited the jury's discretion, *ante*, at 19–20, but I cannot share this conclusion. Although the instruction ostensibly provided some guidance, this appearance is deceiving. As Justice Brennan said of a similar instruction: "Guidance like this is scarcely better than no guidance at all. I do not suggest that the instruction itself was in error; indeed, it appears to have been a correct statement of [state] law. The point is, rather, that the instruction reveals a deeper flaw: the fact that punitive damages are imposed by juries guided by little more than an admonition to do what they think is best." *Browning-Ferris, supra,* at 281 (concurring opinion). I agree wholeheartedly. Vague references to "the character and the degree of the wrong" and the "necessity of preventing similar wrong" do not assist a jury in making a reasoned decision; they are too amorphous. They restate the overarching principles of punitive damages awards—to punish and deter—without adding meaning to these terms. For example, the trial court did not suggest what relation, if any, should exist between the harm caused and the size of the award, nor how to measure the deterrent effect of a particular award. It provided no information to the jury about criminal fines for comparable conduct or the range of punitive damages awards in similar cases. Nor did it identify the

limitations dictated by retributive and deterrent principles, or advise the jury to refrain from awarding more than necessary to meet these objectives. In short, the trial court's instruction identified the ultimate destination, but did not tell the jury how to get there. Due process may not require a detailed roadmap, but it certainly requires directions of some sort.

*Giaccio* is instructive in this inquiry. There, the State argued that even if the cost-assessment statute was impermissibly vague as written, subsequent state court decisions had adopted meaningful standards for implementing it. The jury in *Giaccio* was thus instructed that it could assess costs against the defendant if it found that he was guilty of misconduct that, while not a criminal offense, warranted a penalty. See *Giaccio*, 382 U. S., at 404. This Court did not accept that this nebulous instruction cured the statute's vagueness. "It may possibly be that the trial court's charge comes nearer to giving a guide to the jury than those that preceded it, but it still falls short of the kind of legal standard due process requires." *Ibid.*

The trial court's instruction in this case fares no better. In fact, the minimal guidance it offered may well have pushed the jury further away from reasoned decisionmaking. Paraphrased slightly, the court's terse instruction told the jury: "Think about how much you hate what the defendants did and teach them a lesson." This is not the sort of instruction likely to produce a fair, dispassionate verdict. Like most common-law punitive damages instructions, this one has "an open-ended, anything-goes quality that can too easily stoke . . . the vindictive or sympathetic passions of juries." P. Huber, Liability: The Legal Revolution and Its Consequences 118 (1988) (hereinafter Huber). Our cases attest to the wildly unpredictable results and glaring unfairness that characterize common-law punitive damages procedures. See *infra*, at 54–55.

One need not look far to see that these so-called standards provide no guidance to Alabama juries. Consider, for example, a recent Alabama case involving a collision between a train and a tractor-trailer truck, which resulted in the death of the driver of the truck. Notwithstanding that the truck pulled onto the tracks right in front of the train, thereby ignoring a stop sign, three warning signs, and five speed bumps, the administratrix of decedent's estate asked for $3 million in punitive damages. The jury, after receiving instructions no more vague than those at issue here, awarded her $15 million. *Whitt* v. *Burlington Northern R. Co.*, No. CV–85–311 (Cir. Ct. Ala., Aug. 23, 1988), aff'd conditionally, 575 So. 2d 1011 (1990) (remitting award to $5 million), stay granted, No. A–408 (90–1250) (Dec. 5, 1990) (KENNEDY, J., Circuit Justice).

That Alabama's "standards" in fact provide no guidance whatsoever was illustrated quite dramatically by Alabama Supreme Court Justice Houston in his concurring opinion in *Charter Hospital of Mobile, Inc.* v. *Weinberg*, 558 So. 2d 909, 916 (1990). He pointed to two cases involving substantially the same misconduct and jury instructions, but having very different results: *Washington Nat. Ins. Co.* v. *Strickland*, 491 So. 2d 872 (Ala. 1985), and *Land & Associates, Inc.* v. *Simmons*, 562 So. 2d 140 (Ala. 1989). In both cases, an insurance agent misrepresented to a prospective insured that coverage would begin as soon as the insured paid the first premium when, in reality, the agent should have known that coverage was conditioned upon a medical examination that the insured was unlikely to pass. See *Strickland, supra,* at 873, 877; *Simmons, supra,* at 142. In one case, the jury handed down a punitive damages award of approximately $21,000 — 15½ times the compensatory damages. See *Strickland, supra,* at 874. In the other case, the jury penalized substantially the same conduct with a punitive damages award of $2,490,000 — 249 times the compensatory award. See *Simmons, supra,* at 151 (Houston, J., concurring spe-

cially).  These vastly disparate results demonstrate that, under Alabama's common-law scheme, any case-to-case consistency among verdicts is purely fortuitous.

This is not a case where more precise standards are either impossible or impractical.  See *Kolender*, 461 U. S., at 361. Just the opposite.  The Alabama Supreme Court has already formulated a list of seven factors that it considers relevant to the size of a punitive damages award:

> " '(1) Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred.  If the actual or likely harm is slight, the damages should be relatively small.  If grievous, the damages should be much greater.
>
> " '(2) The degree of reprehensibility of the defendant's conduct should be considered.  The duration of this conduct, the degree of the defendant's awareness of any hazard which his conduct has caused or is likely to cause, and any concealment or "cover-up" of that hazard, and the existence and frequency of similar past conduct should all be relevant in determining this degree of reprehensibility.
>
> " '(3) If the wrongful conduct was profitable to the defendant, the punitive damages should remove the profit and should be in excess of the profit, so that the defendant recognizes a loss.
>
> " '(4) The financial position of the defendant would be relevant.
>
> " '(5) All the costs of litigation should be included, so as to encourage plaintiffs to bring wrongdoers to trial.
>
> " '(6) If criminal sanctions have been imposed on the defendant for his conduct, this should be taken into account in mitigation of the punitive damages award.
>
> " '(7) If there have been other civil actions against the same defendant, based on the same conduct, this should be taken into account in mitigation of the punitive dam-

ages award.'" *Green Oil Co.* v. *Hornsby,* 539 So. 2d 218, 223–224 (1989), quoting *Aetna Life Ins. Co.* v. *Lavoie,* 505 So. 2d 1050, 1062 (Ala. 1987) (Houston, J., concurring specially).

In my view, these standards—the *"Green Oil* factors"—could assist juries to make fair, rational decisions. Unfortunately, Alabama courts do not give the *Green Oil* factors to the jury. See 539 So. 2d, at 224 (Maddox, J., concurring specially). Instead, the jury has standardless discretion to impose punitive damages whenever and in whatever amount it wants. The *Green Oil* factors play a role only *after* the jury has rendered its verdict. The trial court and other reviewing courts may—but are not required to—take these factors into consideration in determining whether a punitive damages award is excessive. *Id.,* at 223.

Obviously, this *post hoc* application of the *Green Oil* factors does not cure the vagueness of the jury instructions. Cf. *Baggett* v. *Bullitt,* 377 U. S. 360, 373 (1964) ("[J]udicial safeguards do not neutralize the vice of a vague law"). See also *Roberts* v. *United States Jaycees,* 468 U. S. 609, 629 (1984). As respondents candidly admit, judicial review in Alabama is limited to the *amount* of the award. The void-for-vagueness doctrine, on the other hand, is concerned with the *procedures* by which the amount is determined. After-the-fact review of the amount in no way diminishes the fact that the State entrusts its juries with standardless discretion. It thus does not matter that the amount settled upon by the jury might have been permissible under a rational system. Even a wholly irrational process may, on occasion, stumble upon a fair result. What is crucial is that the existing system is not rational. "[P]rocedural due process rules are shaped by the risk of error inherent in the truth-finding process as applied to the generality of cases, not the rare exceptions." *Mathews* v. *Eldridge,* 424 U. S., at 344. The state court justice who devised the *Green Oil* factors, Justice Houston, has recognized this. Addressing a vagueness chal-

lenge to the State's punitive damages procedures, he wrote: "We have attempted to deal with the issue of the reliability of punitive damages assessments by post-trial review only. *That attempt does not really address the issue.*" *Charter Hospital*, 558 So. 2d, at 915 (opinion concurring specially) (emphasis added; citations omitted).

## II

For the reasons stated above, I would hold that Alabama's common-law punitive damages scheme is void for vagueness. But the Court need not agree with me on this point in order to conclude that Pacific Mutual was denied procedural due process. Whether or not the Court agrees that the jury instructions were so vague as to be unconstitutional, there can be no doubt but that they offered substantially less guidance than is possible. Applying the test of procedural due process set out in *Mathews* v. *Eldridge, supra,* more guidance was required. Modest safeguards would make the process significantly more rational without impairing any legitimate governmental interest.

## A

In *Mathews* v. *Eldridge, supra,* at 334, we recognized that "'"[d]ue process," unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances. *Cafeteria Workers* v. *McElroy,* 367 U. S. 886, 895 (1961).'" "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey* v. *Brewer,* 408 U. S. 471, 481 (1972). Accordingly, *Mathews* described a sliding-scale test for determining whether a particular set of procedures was constitutionally adequate. We look at three factors: (1) the private interest at stake; (2) the risk that existing procedures will wrongly impair this private interest, and the likelihood that additional procedural safeguards can effect a cure; and (3) the governmental interest in avoiding these additional procedures. *Mathews, supra,* at 335.

Applying the *Mathews* test to Alabama's common-law punitive damages scheme, it is clear that the state procedures deprive defendants of property without due process of law. The private property interest at stake is enormous. Without imposing any legislative or common-law limits, Alabama authorizes juries to levy civil fines ranging from zero to tens of millions of dollars. Indeed, a jury would not exceed its discretion under state law by imposing an award of punitive damages that was deliberately calculated to bankrupt the defendant. Unlike compensatory damages, which are tied to an actual injury, there is no objective standard that limits the amount of punitive damages. Consequently, "'the impact of these windfall recoveries is unpredictable and potentially substantial.'" *Bankers Life & Casualty Co.* v. *Crenshaw*, 486 U. S. 71, 87 (1988) (O'CONNOR, J., concurring in part and concurring in judgment), quoting *Electrical Workers* v. *Foust*, 442 U. S. 42, 50 (1979).

Compounding the problem, punitive damages are quasi-criminal punishment. Unlike compensatory damages, which serve to allocate an existing loss between two parties, punitive damages are specifically designed to exact punishment in excess of actual harm to make clear that the defendant's misconduct was especially reprehensible. Hence, there is a stigma attached to an award of punitive damages that does not accompany a purely compensatory award. The punitive character of punitive damages means that there is more than just money at stake. This factor militates in favor of strong procedural safeguards.

The second *Mathews* prong focuses on the fairness and reliability of existing procedures. This is a question we have spoken to before. Over the last 20 years, the Court has repeatedly criticized common-law punitive damages procedures on the ground that they invite discriminatory and otherwise illegitimate awards. *E. g.*, *Gertz*, 418 U. S., at 350 (common-law procedures leave juries "free to use their discretion selectively to punish expressions of unpopular

views"); *Electrical Workers, supra,* at 50–51, and n. 14 ("[P]unitive damages may be employed to punish unpopular defendants"); *Rosenbloom* v. *Metromedia, Inc.,* 403 U. S. 29, 84 (1971) (MARSHALL, J., dissenting) ("This discretion allows juries to penalize heavily the unorthodox and the unpopular and exact little from others"); *Smith* v. *Wade,* 461 U. S. 30, 59 (1983) (REHNQUIST, J., dissenting) ("[P]unitive damages are frequently based upon the caprice and prejudice of jurors"). For this reason, the Court has forbidden the award of punitive damages in certain defamation suits brought by private plaintiffs, *Gertz, supra,* at 349–350, and in unfair representation suits brought against labor unions under the Railway Labor Act, *Electrical Workers, supra,* at 52.

Although our cases have not squarely addressed the due process question before us today, see *Browning-Ferris,* 492 U. S., at 276–277, we have strongly hinted at the answer. See *ante,* at 9–12. Justice Brennan and JUSTICE MARSHALL joined the Court's opinion in *Browning-Ferris,* but wrote separately to express their "understanding that it leaves the door open for a holding that the Due Process Clause constrains the imposition of punitive damages in civil cases brought by private parties." 492 U. S., at 280 (Brennan, J., concurring). In a separate opinion that JUSTICE STEVENS joined, I voiced strong concerns "regarding the vagueness and procedural due process problems presented by juries given unbridled discretion to impose punitive damages." *Id.,* at 283 (opinion concurring in part and dissenting in part). This echoed my earlier statement, with which JUSTICE SCALIA joined, in *Bankers Life, supra,* at 88: "This grant of wholly standardless discretion to determine the severity of punishment appears inconsistent with due process" (opinion concurring in part and concurring in judgment).

As explained above, see *supra,* at 52–53, Alabama's grant of standardless discretion to juries is not remedied by *post hoc* judicial review. At best, this mechanism tests whether the award is grossly excessive. This is an important sub-

stantive due process concern, but our focus here is on the requirements of procedural due process. Cf. *Santosky* v. *Kramer*, 455 U. S. 745, 757 (1982) ("Retrospective case-by-case review cannot preserve fundamental fairness when a class of proceedings is governed by a constitutionally defective evidentiary standard").

Even if judicial review of award amounts could potentially minimize the evils of standardless discretion, Alabama's review procedure is not up to the task. For one thing, Alabama courts cannot review whether a jury properly applied permissible factors, because juries are not told which factors are permissible and which are not. See Wheeler, The Constitutional Case for Reforming Punitive Damages Procedures, 69 Va. L. Rev. 269, 290 (1983) (hereinafter Wheeler). Making effective review even more unlikely, the primary component of Alabama's review mechanism is deference. The State Supreme Court insists that a jury's award of punitive damages carries a "presumption of correctness" that a defendant must overcome before remittitur is appropriate. *Green Oil*, 539 So. 2d, at 222, 224. Reviewing courts are thus required to uphold the jury's exercise of unbridled, unchanneled, standardless discretion unless the amount happened upon by the jury cannot be reconciled with even the most generous application of the *Green Oil* factors.

That is precisely what happened here. When Pacific Mutual challenged the State's procedures governing awards of punitive damages, the trial court simply deferred to the jury. The judge noted that he "would in all likelihood have rendered a lesser amount," App. to Pet. for Cert. A–15, but that the verdict was not excessive or unfair because "[t]he jury was composed of male and female, white and black and . . . acted conscientiously throughout the trial." *Ibid.* Relying on the trial judge's refusal to disturb the verdict, the State Supreme Court afforded it a double dose of deference, stating that "jury verdicts are presumed correct, and that presump-

tion is strengthened when the presiding judge refuses to grant a new trial." 553 So. 2d 537, 543 (1989).

This strong deference is troubling given that the Alabama Supreme Court has explicitly acknowledged that its current procedures provide for "'unguided discretion,'" *Green Oil*, 539 So. 2d, at 222, and in no way dictate a rational jury verdict: "'The current system furnishe[s] virtually no yardstick for measuring the amount of the award over against the purpose of the award.'" *Ibid.*, quoting *Ridout's-Brown Service, Inc.* v. *Holloway*, 397 So. 2d 125, 127–128 (Ala. 1981) (Jones, J., concurring specially). "[I]t is possible for a jury to hear the evidence in the case, make findings of fact, correctly apply the law, and still, albeit unwittingly, assess damages that bear no reasonable relationship to the accomplishment of [punishment and deterrence] goals." 539 So. 2d, at 222. Thus, the State Supreme Court recognizes that its common-law procedures produce irrational results, yet insists on deferring to these results. Blind adherence to the product of recognized procedural infirmity is not judicial review as I understand it. It is an empty exercise in rationalization that creates only the appearance of evenhanded justice.

Crucial to *Mathews'* second prong, the procedural infirmities here are easily remedied. The Alabama Supreme Court has already given its approval to the *Green Oil* factors. By giving these factors to juries, the State would be providing them with some specific standards to guide their discretion. This would substantially enhance the fairness and rationality of the State's punitive damages system. Other procedural safeguards might prove equally effective. For example, state legislatures could establish fixed monetary limits for awards of punitive damages for particular kinds of conduct. So long as the legislatively determined ranges are sufficiently narrow, they could function as meaningful constraints on jury discretion while at the same time permitting juries to render individualized verdicts.

Another possibility advocated by several commentators, see *ante*, at 23, n. 11; Wheeler 300–301, is that States could bifurcate trials into liability and punitive damages stages. At the punitive damages stage, clear and convincing evidence that the defendant acted with the requisite culpability would be required. This would serve two goals. On a practical level, the clear-and-convincing-evidence requirement would constrain the jury's discretion, limiting punitive damages to the more egregious cases. This would also permit closer scrutiny of the evidence by trial judges and reviewing courts. See Ellis, Punitive Damages, Due Process, and the Jury, 40 Ala. L. Rev. 975, 995–996 (1989). On a symbolic level, the higher evidentiary standard would signal to the jury that it should have a high level of confidence in its factual findings before imposing punitive damages. *Id.*, at 995; Wheeler 297–298. Any of these rudimentary modifications would afford more meaningful guidance to juries, thereby lessening the chance of arbitrary and discriminatory awards, without impairing the State's legitimate interests in punishment and deterrence. Given the existence of several equally acceptable methods, concerns of federalism and judicial restraint counsel that this Court should not legislate to the States which particular method to adopt. I would thus leave it to individual States to decide what method is most consistent with their objectives.

The final *Mathews* factor asks whether the State has a legitimate interest in preserving standardless jury discretion that is so compelling as to render even modest procedural reforms unduly burdensome. The Court effectively answered this question in *Gertz*, 418 U. S., at 349, announcing that "the States have *no substantial interest* in securing for plaintiffs . . . gratuitous awards of money damages far in excess of actual injury." (Emphasis added.)

Respondents do not give up easily. They point out that the State has a substantial interest in deterring wrongful conduct and draw from this a peculiar argument. They con-

tend that, by making jury awards more predictable, procedural safeguards will tend to diminish the deterrent effect of punitive damages. If award amounts are predictable, they argue, corporations will not avoid wrongdoing; instead, they will merely calculate the probability of a punitive damages award and factor it in as a cost of doing business. Accordingly, to best advance the State's interest in deterrence, juries must be given unbridled discretion to render awards that are wildly unpredictable.

This argument goes too far. While the State has a legitimate interest in avoiding rigid strictures so that a jury may tailor its award to specific facts, the Due Process Clause does not permit a State to classify arbitrariness as a virtue. Indeed, the point of due process — of the law in general — is to allow citizens to order their behavior. A State can have no legitimate interest in deliberately making the law so arbitrary that citizens will be unable to avoid punishment based solely upon bias or whim. The procedural reforms suggested here in no way intrude on the jury's ability to exercise reasoned discretion, nor do they preclude flexible decisionmaking. Due process requires only that a jury be given a measurable degree of guidance, not that it be straitjacketed into performing a particular calculus.

Similarly, the suggested procedural safeguards do not impair the State's punishment objectives. Admittedly, the State has a strong interest in punishing wrongdoers, but it has no legitimate interest in maintaining in pristine form a common-law system that imposes disproportionate punishment and that subjects defendants guilty of similar misconduct to wholly different punishments. Due process requires, at some level, that punishment be commensurate with the wrongful conduct. See *Solem* v. *Helm*, 463 U. S. 277, 284–290 (1983); *id.*, at 311, n. 3 (Burger, C. J., dissenting). The State can therefore have no valid objection to procedural measures that merely ensure that punitive damages awards

are based on some factual or legal predicate, rather than the personal predilections and whims of individual jurors.

## B

In his concurrence, JUSTICE SCALIA offers a very different notion of what due process requires. He argues that a practice with a long historical pedigree is immune to reexamination. *Ante*, at 38. The Court properly rejects this argument. *Ante*, at 18. A static notion of due process is flatly inconsistent with *Mathews*, 424 U. S., at 334–335, in which this Court announced that the requirements of the Due Process Clause are "'flexible'" and may vary with "'time, place and circumstances.'" We have repeatedly relied on the *Mathews* analysis, and our recent cases leave no doubt as to its continued vitality. See, *e. g.*, *Washington* v. *Harper*, 494 U. S. 210, 229 (1990); *Brock* v. *Roadway Express, Inc.*, 481 U. S. 252, 261–262 (1987); *Walters* v. *National Assn. of Radiation Survivors*, 473 U. S. 305, 320–321 (1985); *Cleveland Bd. of Ed.* v. *Loudermill*, 470 U. S. 532, 542–543 (1985); *Ake* v. *Oklahoma*, 470 U. S. 68, 77 (1985); *Schall* v. *Martin*, 467 U. S. 253, 274 (1984).

Due process is not a fixed notion. Procedural rules, "even ancient ones, must satisfy contemporary notions of due process." *Burnham* v. *Superior Court of Cal., County of Marin*, 495 U. S. 604, 630 (1990) (Brennan, J., concurring in judgment). Although history creates a strong presumption of continued validity, "the Court has the authority under the [Fourteenth] Amendment to examine even traditionally accepted procedures and declare them invalid." *Id.*, at 628 (WHITE, J., concurring in part and concurring in judgment), citing *Shaffer* v. *Heitner*, 433 U. S. 186 (1977).

The Court's decision in *Williams* v. *Illinois*, 399 U. S. 235 (1970), is also instructive. In *Williams*, the Court invalidated on equal protection grounds the time-honored practice of extending prison terms beyond the statutory maximum

when a defendant was unable to pay a fine or court costs. The Court's language bears repeating:

"[N]either the antiquity of a practice nor the fact of steadfast legislative and judicial adherence to it through the centuries insulates it from constitutional attack . . . .

"The need to be open to reassessment of ancient practices other than those explicitly mandated by the Constitution is illustrated by the present case since the greatly increased use of fines as a criminal sanction has made nonpayment a major cause of incarceration in this country." *Id.*, at 239–240.

Punitive damages are similarly ripe for reevaluation. In the past, such awards "merited scant attention" because they were "rarely assessed and likely to be small in amount." Ellis, Fairness and Efficiency in the Law of Punitive Damages, 56 S. Cal. L. Rev. 1, 2 (1982). When awarded, they were reserved for the most reprehensible, outrageous, or insulting acts. See F. Pollock, Law of Torts (1887); Huber 119. Even then, they came at a time when compensatory damages were not available for pain, humiliation, and other forms of intangible injury. Punitive damages filled this gap. See K. Redden, Punitive Damages § 2.3(A) (1980); Note, Exemplary Damages in the Law of Torts, 70 Harv. L. Rev. 517, 519–520 (1957).

Recent years, however, have witnessed an explosion in the frequency and size of punitive damages awards. See RAND Institute for Civil Justice, M. Peterson, S. Sarma, & M. Shanley, Punitive Damages—Empirical Findings iii (1987) (hereinafter RAND). A recent study by the RAND Corporation found that punitive damages were assessed against 1 of every 10 defendants who were found liable for compensatory damages in California. *Id.*, at viii. The amounts can be staggering. Within nine months of our decision in *Browning-Ferris*, there were no fewer than six punitive damages awards of more than $20 million. Crovitz, Absurd Punitive Damages Also "Mock" Due Process, Wall St.

Journal, Mar. 14, 1990, p. A19, col. 3. Medians as well as averages are skyrocketing, meaning that even routine awards are growing in size. RAND vi, ix, 65. The amounts "seem to be limited only by the ability of lawyers to string zeros together in drafting a complaint." *Oki America, Inc.* v. *Microtech Int'l, Inc.*, 872 F. 2d 312, 315 (CA9 1989) (Kozinski, J., concurring).

Much of this is attributable to changes in the law. For 200 years, recovery for breach of contract has been limited to compensatory damages. In recent years, however, a growing number of States have permitted recovery of punitive damages where a contract is breached or repudiated in bad faith. See, *e. g., Seaman's Direct Buying Serv., Inc.* v. *Standard Oil Co.*, 36 Cal. 3d 752, 686 P. 2d 1158 (1984). Unheard of only 30 years ago, bad faith contract actions now account for a substantial percentage of all punitive damages awards. See RAND iv. Other significant legal developments include the advent of product liability and mass tort litigation. "As recently as a decade ago, the largest award of punitive damages affirmed by an appellate court in a products liability case was $250,000. . . . Since then, awards more than 30 times as high have been sustained on appeal." *Browning-Ferris*, 492 U. S., at 282 (O'CONNOR, J., concurring in part and dissenting in part). "Today, hardly a month goes by without a multimillion-dollar punitive damages verdict in a product liability case." Wheeler, A Proposal for Further Common Law Development of the Use of Punitive Damages in Modern Product Liability Litigation, 40 Ala. L. Rev. 919 (1989).

As in *Williams*, the time has come to reassess the constitutionality of a time-honored practice. The explosion in the frequency and size of punitive damages awards has exposed the constitutional defects that inhere in the common-law system. That we did not discover these defects earlier is regrettable, but it does not mean that we can pretend that they do not exist now. "[N]ew cases expose old infirmities which

apathy or absence of challenge has permitted to stand. But the constitutional imperatives . . . must have priority over the comfortable convenience of the status quo." *Williams*, 399 U. S., at 245. Circumstances today are different than they were 200 years ago, and nothing in the Fourteenth Amendment requires us to blind ourselves to this fact. See Wheeler 277. Just the opposite is true. The Due Process Clause demands that we possess some degree of confidence that the procedures employed to deprive persons of life, liberty, and property are capable of producing fair and reasonable results. When we lose that confidence, a change must be made.

III

" 'The touchstone of due process is protection of the individual against arbitrary action of government.'" *Daniels* v. *Williams*, 474 U. S. 327, 331 (1986), quoting *Dent* v. *West Virginia*, 129 U. S. 114, 123 (1889). Alabama's common-law scheme for awarding punitive damages provides a jury with "such skeletal guidance," *Browning-Ferris*, *supra*, at 281 (Brennan, J., concurring), that it invites — even requires — arbitrary results. It gives free reign to the biases and prejudices of individual jurors, allowing them to target unpopular defendants and punish selectively. In short, it is the antithesis of due process. It does not matter that the system has been around for a long time, or that the result in this particular case may not seem glaringly unfair. The common-law scheme yields unfair and inconsistent results "in so many instances that it should be held violative of due process in every case." *Burnham*, 495 U. S., at 628 (WHITE, J., concurring in part and concurring in judgment).

I would require Alabama to adopt some method, either through its legislature or its courts, to constrain the discretion of juries in deciding whether or not to impose punitive damages and in fixing the amount of such awards. As a number of effective procedural safeguards are available, we need not dictate to the States the precise manner in which

they must address the problem. We should permit the States to experiment with different methods and to adjust these methods over time.

This conclusion is neither groundbreaking nor remarkable. It reflects merely a straightforward application of our Due Process Clause jurisprudence. Given our statements in recent cases such as *Browning-Ferris, supra,* and *Bankers Life & Casualty Co.* v. *Crenshaw,* 486 U. S. 71 (1988), the parties had every reason to expect that this would be the Court's holding. Why, then, is it consigned to a dissent rather than a majority opinion? It may be that the Court is reluctant to afford procedural due process to Pacific Mutual because it perceives that such a ruling would force us to evaluate the constitutionality of every State's punitive damages scheme. I am confident, though, that if we announce what the Constitution requires and allow the States sufficient flexibility to respond, the constitutional problems will be resolved in time without any undue burden on the federal courts. Indeed, it may have been our hesitation that has inspired a flood of petitions for certiorari. For more than 20 years, this Court has criticized common-law punitive damages procedures, see *supra,* at 54–55, but has shied away from its duty to step in, hoping that the problems would go away. It is now clear that the problems are getting worse, and that the time has come to address them squarely. The Court does address them today. In my view, however, it offers an incorrect answer.