**Dwayne SCHWENK, Plaintiff,**

v.

**Michael KAVANAUGH, Ulster County District Attorney; and Kathleen Keating, Assistant District Attorney, Ulster County, Defendants.**

No. 94–CV–773.

United States District Court,
N.D. New York.

March 5, 1998.

Ricken, Goldman, Sussman & Blythe, Kingston, NY (Alan N. Sussman, of counsel), for Plaintiff.

Cook, Tucker, Netter & Clonan, Kingston, NY (Robert E. Netter, of counsel), for Defendants.

### MEMORANDUM–DECISION and ORDER

HURD, United States Magistrate Judge.

## I. INTRODUCTION

Plaintiff, Dwayne Schwenk ("Schwenk" or "plaintiff"), brought this action pursuant to 42 U.S.C. § 1983. All federal and state law claims were dismissed except his due process

claim under the Fourteenth Amendment. *See Schwenk v. Kavanaugh,* No. 94–CV–773, Report–Recommendation (N.D.N.Y. Oct. 11, 1995) (Hurd, M.J.); Order (Aug. 8, 1996) (Scullin, D.J.). Familiarity with the prior decisions is assumed.

The defendants are Michael Kavanaugh ("Kavanaugh"), the Ulster County District Attorney, and Kathleen Keating ("Keating") who was an Ulster County Assistant District Attorney at the time of the incidents leading to this action. Keating is now an Assistant District Attorney in Kings County. The defendants have denied the material allegations in the complaint. However, defendants did not allege qualified immunity as an affirmative defense, nor have they asserted qualified immunity in motions or submissions. Therefore, it will not be considered. *See Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980); *Castro v. United States,* 34 F.3d 106, 111 (2d Cir.1994).

## II. *TRIAL*

■ A one day bench trial was conducted on September 30, 1997. The plaintiff was the only witness on his own behalf. The defendants were the only witnesses on their behalf. The parties entered into three fact stipulations, (Ct.Ex.1, 2, 3), and also stipulated to the admission of a number of exhibits. In addition, the defendants failed to produce the Ulster County District Attorney's file concerning the criminal prosecution of the plaintiff. This file was "lost" while under defendants' control, and after defendants had produced it at a deposition but then refused to permit the plaintiff's attorney to examine it. The explanation given at trial for losing the file and failing to produce it was unsatisfactory. Therefore, an inference will be drawn that the missing file did, in fact, contain information adverse to the defendants. *See Coates v. Johnson & Johnson,* 756 F.2d 524, 552 (7th Cir.1985); *Knightsbridge Mktg. Servs., Inc. v. Promociones Y Proyectos, S.A.,* 728 F.2d 572, 575 (1st Cir. 1984); *Boyd v. Ozark Air Lines, Inc.,* 568 F.2d 50, 53 (8th Cir.1977); *In re Grace Line, Inc.; Imperial Commodities Corp. v. Grace Line Inc.,* 517 F.2d 404, 409 (2d Cir.1975); *Vick v. Texas Employment Comm'n,* 514 F.2d 734, 737 (5th Cir.1975); *Rosario v. Coughlin,* No. 88–CV–56, 1995 WL 57417, at *5 (N.D.N.Y. Feb. 8, 1995). In particular, the inferences will be drawn that the missing file would have shown that the records from Benedictine Hospital were delivered to the District Attorney's office; that Keating came into possession of the hospital records; and that she reviewed them prior to trial. These inferences are, of course, subject to rebuttal.

Post trial briefs and supplemental proposed findings of fact and conclusions of law were filed on October 28–29, 1997. Based upon all of the evidence, including the credibility of the witnesses, stipulations, inferences, and exhibits, the following are the Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52.

## III. *FINDINGS OF FACT*

During the fall of 1992, Schwenk was indicted by the Ulster County Grand Jury for the felony crime of burglary. The trial was scheduled in Ulster County Court for January 12, 1993.

On November 30, 1992, the plaintiff was committed to the psychiatric wing of Benedictine Hospital located in Kingston, New York. He remained there until December 2, 1992. He was committed! by members of the New York State Police as the result of excessive drinking and a suicide attempt. He was placed on "involuntary" status. During his three day stay at the hospital, he interacted with doctors, nurses, and counselors, and divulged intimate personal details of his life and the lives of other members of his family.

Keating was directly in charge of prosecuting the criminal case against the plaintiff. When she learned about Schwenk's confinement at Benedictine Hospital, she decided to subpoena his hospital records on the chance that they might contain information which could be helpful to her direct case or to impeach the plaintiff in the event he testified in his own behalf. She caused a judicial subpoena duces tecum ("subpoena") to be prepared, (Pl.'s Ex. 1), obtained Kavanaugh's signature, and presented it to Ulster County Court Judge Francis T. Vogt. Judge Vogt "So Ordered" the subpoena. Keating had no conversation with Judge Vogt regarding her

need for Schwenk's hospital records. Neither did she notify the plaintiff or his criminal defense attorney, Assistant Public Defender Paul L. Gruner ("Gruner"), that she was subpoenaing the hospital records. Judge Vogt did not hold a hearing or make a finding weighing the prosecution's need for the hospital records versus Schwenk's right to confidentiality.

Keating then caused the subpoena to be served upon Benedictine Hospital. In response thereto, Benedictine Hospital delivered a certified copy of Schwenk's hospital records directly to the District Attorney's office. Based upon a review and evaluation of Keating's testimony, the inferences drawn from the Ulster County District Attorney's "lost" file regarding the criminal prosecution of Schwenk, and the entire record, the conclusion is reached that Keating did, in fact, review the hospital records prior to appearing in court for the start of the plaintiff's criminal trial on January 12, 1993. She came into the possession of detailed intimate, private knowledge and information about the plaintiff. There is no evidence that Kavanaugh reviewed the hospital records at any time.

Neither the plaintiff nor his attorney raised mental capacity or mental disability of any type as a defense to the prosecution against him for burglary. Neither the plaintiff nor his attorney consented to the release of any of plaintiff's private medical or psychiatric records, or waived the right to keep those records confidential. Keating never asked for such consent.

Schwenk was present only on the first day of the trial, and at some point Keating informed Gruner that she had subpoenaed the Benedictine Hospital records. He, in turn, advised Judge Vogt about the hospital records, and objected that it was improper for Keating to have them in her possession. Judge Vogt agreed, and ordered Keating to turn the Benedictine Hospital records over to plaintiff's defense counsel. Keating remained silent. Thereafter, the hospital records were, in fact, turned over to him.

Plaintiff was found guilty of the charges after trial and was sentenced to a term of prison. He was confined to the Groveland Correctional Facility. In the course of preparing an appeal of his conviction, and in reviewing the transcript of the trial, Schwenk learned for the first time that the records regarding his psychiatric treatment at Benedictine Hospital had been in the possession of the Ulster County District Attorney's Office. He requested the hospital records from attorney Denise Dourdeville ("Dourdeville"), who was employed by the Ulster County Public Defender. She complied with the plaintiff's request and mailed him the copy of the Benedictine Hospital records which were located in plaintiff's file at the Public Defender's Office. Dourdeville placed a manilla envelope containing the hospital records and a cover letter into another envelope and mailed the package to the plaintiff on or about April 7, 1994. In plaintiff's presence, a prison guard opened both the outer envelope and the inner envelope pursuant to prison procedures. Upon reviewing the hospital records, Schwenk found detailed information regarding his suicide attempt, his sister's schizophrenia, his father's depression, and his mother's nervous breakdown. He also found detailed information about his sex life, his history of drug and alcohol abuse, and his friends and acquaintances.

As a result of learning that his hospital records from Benedictine Hospital had been in the possession of the District Attorney's office without his knowledge, and with no information as to where else, if anywhere, these records may have been, the plaintiff became upset. He withdrew within himself and became less trustful and open in discussing his psychological problems with his therapy group at the prison. However, he did show the hospital records to a man named Beck, a fellow inmate, to review for the possibility of a legal action. Otherwise, the plaintiff kept the hospital records in his sole possession. In conclusion, the only people who actually saw the hospital records, or at least had an opportunity to review them in detail, were Keating, Gruner, Dourdeville, Beck, and the plaintiff. The plaintiff neither sought, nor received, any further psychiatric treatment as the result of discovering that his records from the Benedictine Hospital

had, unbeknownst to him, been disclosed to the Ulster County District Attorney's office.

## IV. *CONCLUSIONS OF LAW*

### A. *Liability*

■ Any person who, under color of state law, deprives another person of his or her Constitutional rights is liable for injuries caused by the deprivation. 42 U.S.C. § 1983. Plaintiff has a constitutional right to privacy, encompassing confidentiality of medical information. *Whalen v. Roe,* 429 U.S. 589, 599–600, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977); *Doe v. City of New York,* 15 F.3d 264, 267 (2d Cir.1994); *Schachter v.. Whalen,* 581 F.2d 35, 37 (2d Cir.1978). At all relevant times Kavanaugh and Keating were acting under color of state law.

■ Where, as here, a constitutional privacy right exists, the public interest in disclosure must be weighed against the need for continued confidentiality. *See Doe v. City of New York,* 15 F.3d at 269; *Schachter,* 581 F.2d at 37. Disclosure violates the constitution unless the public interest substantially outweighs the need for confidentiality. *See Doe v. City of New York,* 15 F.3d at 269; *Schachter,* 581 F.2d at 37. Various New York state laws provide for procedures to be followed in obtaining medical and psychiatric records, which assure that the balancing of public interest and the need for confidentiality is done prior to disclosure. *See* N.Y.Civ. Prac.L. & R. §§ 4504(a) (McKinney Supp. 1997–1998) (prohibiting disclosure of medical information obtained in the course of treatment), 2302(a) (McKinney Supp.1997–1998) (requiring court order to be included with subpoena for clinical record kept pursuant to Mental Hygiene Law); N.Y.Crim.Proc.Law § 60.55 (McKinney 1992) (psychiatric testimony admissible only upon issue of affirmative defense of mental disease or defect); N.Y. Mental Hyg. Law § 33.13 (McKinney 1996)(permitting release of clinical records only with a court order "requiring disclosure upon a finding by the court that the interests of justice significantly outweigh the need for confidentiality").

■ Kavanaugh and Keating violated the plaintiff's constitutional right to privacy and due process guaranteed by the Fourteenth Amendment in a number of ways. In the first place, neither articulated a valid reason why the public interest in subpoenaing the hospital records which involved plaintiff's psychiatric treatment significantly outweighed his privacy interests. The plaintiff apparently confessed to the criminal charges to the members of the New York State Police who committed him to the Benedictine Hospital. As noted above, Schwenk never raised his mental capacity as a defense to the criminal charges, and his mental condition was never at issue in the criminal case. The prosecution's need for the hospital records in this case was, in reality, merely an illusion. Issuing the subpoena was an exercise in the proverbial "fishing expedition." It is significant to note that Keating at no time ever even attempted to explain the need for Schwenk's hospital records to Judge Vogt, and when confronted with the impropriety of having the hospital records in her possession, did not protest, but by her silence, quickly agreed to turn them over to plaintiff's defense counsel.

In the second place, Kavanaugh and Keating caused the subpoena to be issued and the hospital records to be produced without complying with the state statutes set forth above; without notifying the plaintiff or his attorney of their intentions and giving them an opportunity to object; and without requesting a hearing before Judge Vogt. Rather, Keating just routinely placed the subpoena before Judge Vogt for his signature.

Third, the subpoena improperly directed Benedictine Hospital to deliver the records directly to the District Attorney's office rather than to the court. If the hospital records had been delivered to Judge Vogt's court, they could have remained sealed until such time as Keating requested permission to use the hospital records during the trial. Judge Vogt was denied the opportunity to hold a hearing and to make a judicial review of the hospital records prior to allowing their release to Keating. Also, delivery to the District Attorney rather than to the court gave Keating the opportunity to read and review Schwenk's private psychiatric records prior to trial without his knowledge.

Because of the defendants' actions, the plaintiff's right to have his privacy protected by the County Court pursuant to New York Mental Hygiene Law § 33.13 was violated. Further, defendants' actions violated plaintiff's right to privacy guaranteed by the First Amendment and applicable to the states through the Fourteenth Amendment, and to due process guaranteed under the Fourteenth Amendment. Plaintiff, therefore, is entitled to a verdict.

## B. *Damages*

### 1. *Compensatory*

■ The record does not justify an award of compensatory damages. Schwenk testified that he was "in shock" and "stressed" upon receiving the hospital records from the Public Defender's Office in prison, and as a result, he failed to fully participate in the prison therapy program. However, there is no evidence that this in any manner affected the conditions of his confinement or the timing of his release from prison. He also engaged in an Alcoholic's Anonymous program after his release, and again, there is no showing that his reluctance to discuss his personal history hindered his progress in the program. His basic life style was not affected. Neither did he experience any physical changes. He did not suffer any physical problems or any additional emotional difficulties. He did not seek further counseling or psychiatric treatment because of the defendants' acts. *See Annis v. County of Westchester,* 136 F.3d 239, 248 (2d Cir.1998) ("[W]e find that the only evidence of [plaintiff's] emotional distress—her own testimony—is insufficient to warrant an award of compensatory damages for that injury. She has not alleged any physical manifestations of her emotional distress ... [i]n short, her testimony fails to establish that she suffers from any concrete emotional problems.")

### 2. *Nominal*

The plaintiff will be awarded nominal damages in the sum of One Dollar ($1.00).

### 3. *Punitive*

■ The facts support an award of punitive damages. *See Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 19–20, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991) (punitive damages award is to punish, protect public, and deter similar conduct); *Smith v. Wade,* 461 U.S. 30, 52, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983) (punitive damages appropriate where defendant was reckless or displayed callous indifference to the plaintiff's constitutional rights); *see also King v. Macri,* 993 F.2d 294, 297 (2d Cir.1993) (punitive damage award proper in § 1983 case despite absence of compensatory damage award). The defendants have never, at any time, articulated a valid need for the plaintiff's Benedictine Hospital records in prosecuting the burglary charge against him. Further, the hospital records contained details of the plaintiff's most intimate personal thoughts and feelings. They gave a history of mental and emotional problems about himself, his mother, his father, and his sister. They revealed his past behavioral problems involving sex, drugs, and alcohol. They identified his friends. In other words, unlike hospital records regarding treatment for a physical injury such as a broken arm, the hospital records in question were psychiatric records which revealed information of the most compellingly private nature. By knowingly ignoring plaintiff's constitutional due process rights and avoiding judicial review, the defendants, and particularly Keating, were allowed to examine the records in secret and were in a position to share the contents without restraint. *See Pacific Mut. Life Ins. Co.,* 499 U.S. at 19–20, 111 S.Ct. 1032. Such actions by public officials must be deterred, and because we all have personal and private medical or psychiatric records, the public must be protected. *See Pacific Mut. Life Ins. Co.,* 499 U.S. at 19–20, 111 S.Ct. 1032; *Wade,* 461 U.S. at 52, 103 S.Ct. 1625. Therefore, punitive damages are appropriate in order to deter, to protect, and hopefully to set an example for the defendants and others who might be tempted to take a "short cut" in securing possession of a person's mental health records. *See Pacific Mut. Life Ins. Co.,* 499 U.S. at 19–20, 111 S.Ct. 1032.

Before the amount of punitive damages can be set, the parties are entitled to an evidentiary hearing limited to the assets and liabilities of the defendants. The hearing may be waived. A demand for a hearing must be filed and served on or before March 20, 1998. Failure to file will be considered a waiver, and the amount of punitive damages shall be decided based upon the present record.

In the alternative, the attorneys for the defendants may file and serve on or before March 20, 1998, an attestation that any award for punitive damages which is sustained on appeal will be paid by Ulster County. In that event, and if the filing is satisfactory, an evidentiary hearing will not be held. *See Mathie v. Fries,* 121 F.3d 808, 816 (2d Cir.1997).

### 4. *Attorney's Fees an Expenses*

As the prevailing party on at least one significant issue, the plaintiff is entitled to attorney's fees and expenses. 42 U.S.C. § 1988; *Carroll v. Blinken,* 105 F.3d. 79, 81–82 (2d Cir.1997); *Pino v. Locascio,* 101 F.3d 235, 237–38 (2d Cir.1996) (citing *Farrar v. Hobby,* 506 U.S. 103, 115, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992)). The award may be total or partial. The plaintiff will be permitted to file and serve an application for attorney's fees and expenses after the amount of punitive damages is determined. The defendants will also be permitted to file and serve opposition papers.

Final judgment will be entered following the decisions regarding punitive damages, attorney's fees, and expenses. The parties are encouraged to settle or stipulate those amounts.

IT IS SO ORDERED.